CITY OF ROMULUS v DEPARTMENT OF ENVIRONMENTAL QUALITY

Docket No. 236673. Submitted August 19, 2003, at Detroit. Decided
December 16, 2003, at 9:05 A.M. Leave to appeal sought.

Environmental Disposal Systems, Inc. (EDS), submitted to the Department of Environmental Quality (DEQ) an application for a permit
under Part 111 of the Natural Resources and Environmental Protection Act (NREPA), MCL 324. 11101 *et seq.*, authorizing the construction of a hazardous waste facility on a site in the city of Romulus.
After learning that the site contained wetlands and in view of the
prohibition against locating new hazardous waste facilities in wetlands, as provided by 1999 AC R 299.9603 (Rule 603), EDS applied
for and was granted by the DEQ a permit under Part 303 of the
NREPA, MCL 324.30301 *et seq.*, authorizing EDS to fill the wetlands.
Despite a recommendation by a site review board (SRB) against the
issuance of a Part 111 permit, the DEQ issued a Part 111 permit to
EDS, authorizing EDS to build the hazardous waste facility. The cities
of Romulus and Taylor petitioned the Wayne Circuit Court for judicial review of the DEQ's decision to issue the Part 111 permit. The
court, Amy Patricia Hathaway, J., allowed EDS to intervene as a
respondent and affirmed the DEQ's decision. The Court of Appeals
granted the petitioners leave to appeal.

The Court of Appeals *held*:

1. Rule 603(1)(f) provides that active portions of new treatment,
storage, or disposal facilities or expansions, enlargements, or alterations of existing facilities shall not be located in a wetland. The
DEQ did not violate Rule 603 by issuing a Part 111 permit to EDS.
Nothing in Rule 603 provides that a Part 111 permit cannot be
granted when a wetland exists on the site; rule 603 only provides
that active portions of the facility may not be located in a wetland.
The DEQ can issue a Part 111 permit when the wetland on the site
will be legally eliminated before construction of the facility. Here,
the Part 111 permit was issued with the expectation that EDS would
first fill the wetlands as it was legally permitted to do pursuant to
the Part 303 permit. There is nothing in Rule 603 that prohibits a
treatment, storage, or disposal facility from being located in an
area that is no longer a wetland due to action taken in compliance
with a Part 303 permit.

2. The DEQ was not required to consider whether there was a need in Michigan for an additional hazardous waste facility when issuing the Part 111 permit to EDS. None of the statutes cited by the petitioners in support of their argument that consideration of need was required, MCL 324.11107, 324.11110, 324.11115, 324.11120, 324.14302, 324.14303, and 324.14501 *et seq.*, requires such consideration.

3. The DEQ had a market-driven approach to the issue of need for new hazardous waste facilities in that it allowed private enterprise to determine need. The DEQ was not required to promulgate an administrative rule adopting its market-driven approach to need. Under § 7(j) of the Administrative Procedures Act (APA), MCL 24.207(j), a decision by an agency to exercise or not exercise a permissive statutory power, although private rights or interests are affected, is not a rule. Here, because Part 111 does not require the DEQ to develop standards for its Part 111 permit decisions or to consider need for a particular facility when making its Part 111 permitting decisions, the DEQ's decision not to consider need is a decision not to exercise a permissive statutory power and it is not a rule that must be promulgated under the APA.

4. The DEQ's decision to issue the Part 111 permit to EDS was supported by competent, material, and substantial evidence. The circuit court considered the whole record and did not misapprehend or grossly misapply the substantial evidence test when reviewing the DEQ's decision. The DEQ's decision to issue the Part 111 permit was not arbitrary or capricious. There is no support for the petitioners' argument that the DEQ secretly concluded that it could not legally issue a Part 111 permit to EDS, but did so in any event, in contravention of this conclusion. There is no merit to the petitioners' contention that the DEQ's issuance of the permit was contrary to a DEQ determination that the SRB's reasons for recommending denial of the permit were valid.

Affirmed.

ENVIRONMENT — HAZARDOUS WASTE FACILITIES — WETLANDS — PERMITS.

The Department of Environmental Quality may issue a permit for the construction of a hazardous waste facility in a wetland if the department has already issued a permit for the filling of the wetland (MCL 324.11101 *et seq.*, 324.30301 *et seq.*; 1999 AC, R 299.9603).

*Dykema Gossett PLLC* (by *Marilyn A. Peters, Laura C. Baucus,* and *Mark D. Jacobs*) for city of Romulus.

*Dykema Gossett PLLC* (by *Marilyn A. Peters* and *Laura C. Baucus*) and *Strobl, Cunningham, Caretti & Sharp PC* (by *Neil S. Silver*) for city of Taylor.

*Michael A. Cox,* Attorney General, *Thomas L. Casey,* Solicitor General, and *James L. Stropkai,* Assistant Attorney General, for Department of Environmental Quality.

*Bill Colovos, Warner Norcross & Judd LLP* (by *William Fulkerson, Robert J. Jonker,* and *Michael G. Brady*), and *Beier Howlett, P.C.* (by *Lawrence R. Ternan*), for Environmental Disposal Systems, Inc.

Before: ZAHRA, P.J., and TALBOT and OWENS, JJ.

ZAHRA, P.J., Appellee Environmental Disposal Systems, Inc. (EDS), submitted an application to respondent, the Michigan Department of Environmental Quality (DEQ), for a permit under Part 111 of the Natural Resources and Environmental Protection Act (NREPA), MCL 324.11101 *et seq.*, authorizing the construction of a hazardous waste underground deep injection well facility on an undeveloped site that contained wetlands located in the city of Romulus. 1999 AC, R 299.9603 (Rule 603) provides that new hazardous waste facilities shall not be located in a wetland. After becoming aware that the site contained wetlands, EDS applied for and was granted a permit under Part 303 of the NREPA, MCL 324.30301 *et seq.*, authorizing it to fill the wetlands. Thereafter, the DEQ issued a Part 111 permit to EDS, authorizing it to build the hazardous waste facility. Petitioners initiated proceedings to challenge the DEQ's decision to issue the Part 111 permit to EDS. The circuit court affirmed the issuance of the Part 111 permit, and this

Court granted the application for leave to appeal filed by petitioners city of Romulus and city of Taylor. The most significant issue on appeal is whether the DEQ erred in issuing a Part 111 permit to EDS to build the hazardous waste facility on land designated as a wetland where the DEQ had also issued a Part 303 permit authorizing EDS to fill the wetlands on the site proposed for the facility. We conclude that the DEQ did not err in issuing the Part 111 permit to EDS. Rule 603 provides that a hazardous waste facility shall not be located in a wetland. Here, EDS obtained a Part 303 permit to fill and eliminate the wetlands on the site. The wetlands have been lawfully filled.[1] Thus, EDS would not be building the hazardous waste facility in a wetland. We affirm.

### I. FACTS AND PROCEDURE

EDS, a company in the business of disposing of hazardous waste, sought to build and operate a hazardous waste underground deep injection well facility on an undeveloped site (the Citrin Drive site) located in the city of Romulus. The city of Romulus opposed construction of the hazardous waste facility, and several lawsuits were initiated regarding this issue.[2] EDS obtained many of the federal, state, and municipal permits required for the construction of the facility

---

[1] The DEQ issued the Part 111 permit before EDS filled the wetlands. However, the DEQ issued the Part 111 permit with the understanding and expectation that the wetlands would be filled before construction of the facility commenced.

[2] *Environmental Disposal Systems, Inc v City of Romulus,* unpublished opinion per curiam of the Court of Appeals, issued October 12, 1999 (Docket No. 206694), and *City of Romulus v Environmental Disposal Systems, Inc,* unpublished opinion per curiam of the Court of Appeals, issued October 15, 1999 (Docket No. 207850).

and then applied to the DEQ for a Part 111 hazardous waste management construction permit. The DEQ determined that EDS's application was complete and technically adequate, and then, in conformity with MCL 324.11119, referred the matter to a site review board (SRB). Between October 1999 and March 2000, the SRB held a public hearing and several informal hearings, where it received oral and written statements from local community officials, the public, EDS, and the DEQ regarding the construction of the facility. At one of these hearings, EDS learned that several areas constituting wetlands existed on the Citrin Drive site.[3] At the January 26, 2000, SRB hearing, the DEQ confirmed the existence of the wetlands and informed the SRB that EDS would be required to obtain a Part 303 permit authorizing it to fill the wetlands before it would be allowed to build the facility. EDS subsequently applied for a Part 303 permit.

On March 21, 2000, the SRB recommended that the DEQ deny EDS's application for a Part 111 permit, listing nine reasons for its recommendation. One reason was that there was no need for the facility because there was a surplus of hazardous waste disposal capacity in the area. Another reason for the SRB's recommendation was that wetlands existed on the site and EDS had not obtained a permit to eliminate the wetlands.[4] On June 9, 2000, the DEQ issued a Part 303

---

[3] According to the DEQ, these wetlands did not exist when EDS first submitted its Part 111 permit application in January 1997, but had developed on the site by the time EDS resubmitted its application in May 1999.

[4] The SRB's other seven reasons for its recommendation to deny the permit were as follows: First, the SRB found that the Citrin Drive site was an unsuitable and inappropriate location for the proposed hazardous waste storage and treatment facility because: (a) the site contained only one means of ingress and egress, which was insufficient to ensure adequate access for emergency situations; (b) the proposed facility had an inade-

permit authorizing EDS to fill the wetlands on the Cit-
rin Drive site for the purpose of constructing the haz-
ardous waste facility.

On December 8, 2000, the DEQ issued a "Fact Sheet"
listing five reasons why it was proposing to issue a
Part 111 permit to EDS,[5] and specifically addressing

---

quate water supply and insufficient fire suppression system that created
an unacceptable risk of fire and explosion at the site; (c) EDS's proposed
truck route to the facility was unacceptable because it was along a road-
way system that was already overly congested and had unacceptable
levels of service and EDS's trucks would exacerbate the situation; and (d)
the proposed facility was near the I-94 expressway and two railways and
posed an unacceptable risk of disrupting access to surrounding busi-
nesses and the Detroit Metropolitan Airport in the event of an emergency.
Second, the SRB found that the community surrounding the site lacked
adequate emergency response resources, and the facility had the potential
to overburden those limited resources. Third, the SRB found that the
design of the proposed facility created an unacceptable risk of the pollu-
tion of surface waters and wetlands. Fourth, EDS failed to apply for
approval of the facility under the Romulus Environmental Ordinance, EDS
failed to comply with the site plan and special use approval requirements
of the Romulus zoning ordinance, and the proposed facility did not com-
ply with other zoning ordinance requirements. Fifth, the SRB stated that
there were additional factors that led it to recommend denial of the Part
111 permit, such as the facility's negative effect on property values, future
quality development, and community image, and the fact that the commu-
nity was already overburdened by undesirable land uses. Sixth, the SRB
noted that it had several concerns regarding EDS: (a) there were a number
of inconsistencies in statements, representations, and information pro-
vided by EDS, and those inconsistencies caused the SRB to question
whether EDS should be entrusted with the responsibility of operating the
proposed facility, and (b) EDS employees lacked the experience and exper-
tise to operate a liquid hazardous waste management facility. Seventh,
although EDS represented to the SRB that the waste it would accept at the
facility would consist of ninety to ninety-five percent water, there was
nothing in its application or elsewhere that would limit the waste EDS
accepted to ninety to ninety-five percent water. Without this limitation,
the SRB believed that the proposed facility might present unacceptable
risks to public health and the environment.

[5] The DEQ's five reasons for proposing to issue the permit to EDS were as
follows:

    I. The application submitted by EDS is sufficiently detailed for the
DEQ to evaluate the facility and its impact on human health and the
environment.

and rejecting each of the SRB's reasons for recommending denial of the permit. The DEQ stated that the existence of wetlands on the site was not a reason to deny the Part 111 permit because EDS had obtained a Part 303 permit to fill the wetlands. The DEQ also stated that need for a facility is market-driven and is determined by private industry, so lack of need was not a legitimate reason to deny the Part 111 permit. The DEQ added that the hazardous waste facility proposed by EDS offered a disposal method that varied from those available at the existing facilities in Southeast Michigan.[6] On February 22, 2001, the DEQ issued

---

II. The facility satisfies all of the technical design, construction, and operating standards under Part 111, Hazardous Waste Management, of the Natural Resources and Environmental Protection Act, 1994 PA 451, as amended (Act 451).

III. EDS has obtained all other necessary federal and state environmental permits necessary for construction of the facility.

IV. The disclosure statement does not contain any listings that could be a reason to deny the construction permit.

V. Conditions in the construction permit will address the legitimate reasons for denial that were enumerated by the Site Review Board (SRB).

[6] The DEQ also found that the SRB's other reasons for recommending to deny the permit were either illegitimate or could be mitigated by a special condition in the permit. First, the DEQ addressed the SRB's finding that the Citrin Drive site was an unsuitable and inappropriate location for the proposed hazardous waste storage and treatment facility. The DEQ found that the lack of more than one access road to the site was a legitimate issue, but could be remedied by adding a condition to the permit requiring EDS to provide an alternate emergency access road to the site. The DEQ stated that the lack of adequate water to the site was also a legitimate issue, but could be remedied by adding a condition to the permit requiring EDS to install a looped water supply. The DEQ agreed that the facility could cause transportation congestion, but that this situation could be remedied by adding conditions to the permit limiting the number of trucks EDS used each day on the proposed route and requiring EDS to make roadway improvements. The DEQ found that the proposed facility would not increase the risk of accidents involving tanker trucks and that this was not a legitimate reason to deny the permit. Second, the DEQ concluded that the community surrounding the site did not lack adequate emergency response resources and the facility did not have the potential to overbur-

the Part 111 permit to EDS, authorizing it to build the facility. The DEQ also released a "Responsiveness Summary," in which the DEQ responded to issues raised during a public comment period.

Petitioners appealed the DEQ's decision to issue the Part 111 permit to the circuit court, and EDS intervened as a respondent. On August 24, 2001, the circuit court issued an opinion and order affirming the DEQ's decision to issue the Part 111 permit.[7] In Sep-

---

den those resources, so this was not a legitimate reason to deny the permit. Third, the DEQ stated that the risk of the pollution of surface waters caused by the proposed facility could be remedied by adding a condition to the permit prohibiting EDS from staging trucks on Citrin Drive. Fourth, the DEQ stated that the SRB failed in its responsibility to justify and integrate specific local ordinances and requirements into the EDS project, so the DEQ refused to integrate all of them into the Part 111 permit. However, the DEQ stated that it would require as a condition of the permit EDS's compliance with certain local requirements that would not alter the approved plans and specifications. Fifth, the DEQ did not find any convincing evidence that the facility would negatively affect property values or have other adverse effects identified by the SRB, so these were not legitimate reasons to deny the permit. Sixth, the DEQ stated that the SRB's perceived inconsistencies in EDS's representations involved information that was not relevant to the potential effect the facility would have on the environment or public health, safety, or welfare. Therefore, the DEQ concluded that concerns regarding EDS's integrity was not a legitimate reason to deny the permit. Seventh, the DEQ stated that the SRB erred in its understanding of the types of waste that would be managed at the facility and that the proposed facility was capable of safely managing the wastes authorized in the Part 111 permit and the wastes would not present an unacceptable risk during transportation. The DEQ concluded that this was not a legitimate reason to deny the permit.

[7] The circuit court concluded that the DEQ did not violate Part 111 by issuing EDS a permit to construct the facility on a location that contained wetlands, because EDS had previously obtained a Part 303 permit to eliminate the wetlands. The circuit court further determined that there was no statutory requirement that the DEQ consider need when deciding whether to issue a Part 111 permit. The circuit court was satisfied that the DEQ discussed the SRB's determination that there was no need for the facility, but the court stated that the DEQ was not required to follow the SRB recommendations or consider need. The circuit court also determined that the DEQ was not required to promulgate a rule regarding its "market-driven" approach to need, because the DEQ's decision to exercise or not exercise a permissive power by statute is not considered a rule under the Adminis-

tember 2001, Romulus and Taylor applied for leave to appeal the circuit court's decision that the DEQ properly issued the Part 111 permit. Also in September 2001, EDS began the process of filling the wetlands on the Citrin Drive site. By October 2001, the wetlands were filled and eliminated. This Court subsequently granted Romulus and Taylor's application for leave to appeal.

II. ANALYSIS

A. STANDARD OF REVIEW

This Court applies multiple standards of review in an appeal from a circuit court's review of an administrative agency's decision. Great deference is accorded to the circuit court's review of the agency's factual findings. By contrast, substantially less deference, if any, is accorded to the circuit court's determinations on matters of law.

1. FACTUAL FINDINGS

This Court's review is limited to determining whether the circuit court "misapprehended or grossly misapplied" its review of the agency's factual findings. *Boyd v Civil Service Comm*, 220 Mich App 226, 234; 559 NW2d 342 (1996). The circuit court's review of the DEQ's factual findings is limited to determining whether the decision was supported by competent, material, and substantial evidence on the whole

trative Procedures Act (APA), MCL 24.201 *et seq.* The court noted that the DEQ considered and rejected all the reasons given by the SRB for denying the Part 111 permit and concluded that the DEQ's decision to issue the permit was lawful, was supported by competent, material, and substantial evidence, and was not arbitrary or capricious.

record, was arbitrary or capricious, or was clearly an abuse of discretion. Const 1963, art 6, § 28; *Dignan v Michigan Pub School Employees Retirement Bd*, 253 Mich App 571, 576; 659 NW2d 629 (2002).[8] Evidence is competent, material, and substantial if a reasoning mind would accept it as sufficient to support a conclusion. *Id.* "Courts should accord due deference to administrative expertise and not invade administrative fact finding by displacing an agency's choice between two reasonably differing views." *Id.* To determine whether an agency's decision is "arbitrary," the circuit court must determine if it is " ' "[w]ithout adequate determining principle[,] . . . [f]ixed or arrived at through an exercise of will or by caprice, without consideration or adjustment with reference to principles, circumstances, or significance, . . . decisive but unreasoned." ' " *St Louis v Michigan Underground Storage Tank Financial Assurance Policy Bd*, 215 Mich App 69, 75; 544 NW2d 705 (1996), quoting *Bundo v Walled Lake*, 395 Mich 679, 703 n 17; 238

---

[8] The DEQ and EDS argue that, because a formal evidentiary hearing with witnesses testifying under oath is not required before the DEQ grants or denies a Part 111 permit application, review of the DEQ's decision is limited to whether it was authorized by law. We agree that where the administrative agency was not required to conduct an evidentiary hearing, review is limited to determining whether the agency's actions were authorized by law. *Northwestern Nat'l Cas Co v Comm'r of Ins*, 231 Mich App 483, 488; 586 NW2d 563 (1998). Here, however, the DEQ was required to conduct an evidentiary hearing. Part 111 requires the SRB to "conduct formal *or* informal hearings *to receive evidence on disputed issues* . . . ." MCL 324.11120(8) (emphasis added). It is evident from this statutory language that the purpose of SRB hearings, whether formal or informal, is to "receive evidence on disputed issues." Neither the DEQ nor EDS provides any authority supporting the position that a *formal* hearing must be held to constitute an "evidentiary hearing" under Const 1963, art 6, § 28. We conclude that both the SRB's formal and informal hearings constitute an "evidentiary hearing" under Const 1963, art 6, § 28. Thus, in this case the decision of the DEQ must be reviewed to determine whether it was supported by competent, material, and substantial evidence.

NW2d 154 (1976), quoting *United States v Carmack*, 329 US 230, 243; 67 S Ct 252; 91 L Ed 209 (1946). "Capricious" has been defined as: " ' "[A]pt to change suddenly; freakish; whimsical; humorsome." ' " *St Louis, supra* at 75, quoting *Bundo, supra* at 703 n 17, quoting *Carmack, supra* at 243.

### 2. MATTERS OF LAW

We must also determine "whether the lower court applied correct legal principles . . . ." *Boyd, supra* at 234. The circuit court's review of an administrative agency's decision on a matter of law is limited to determining whether the decision was authorized by law. Const 1963, art 6, § 28; *Boyd, supra* at 232. "[A]n agency's decision that 'is in violation of statute [or constitution], in excess of the statutory authority or jurisdiction of the agency, made upon unlawful procedures resulting in material prejudice, or is arbitrary and capricious,' is a decision that is *not* authorized by law" and must be set aside. *Northwestern Nat'l Cas Co v Comm'r of Ins*, 231 Mich App 483, 488; 586 NW2d 563 (1998) (emphasis in original), quoting *Brandon School Dist v Michigan Ed Special Services Ass'n*, 191 Mich App 257, 263; 477 NW2d 138 (1991).

Here, we are called upon to interpret statutes and administrative rules.[9] As a general rule, we review de novo the interpretation and application of unambiguous statutes and administrative rules. *Michigan Ed Ass'n Political Action Committee (MEAPAC) v Secretary of State*, 241 Mich App 432, 437; 616 NW2d 234

---

[9] "A rule adopted by an agency in accordance with the Administrative Procedures Act, MCL 24.201 *et seq.*, is a legislative rule that has the force and effect of law." *Morley v General Motors Corp*, 252 Mich App 287, 290; 651 NW2d 808 (2002).

(2000). Principles of statutory interpretation apply to the construction of administrative rules. *Detroit Base Coalition for Human Rights of the Handicapped v Dep't of Social Services*, 431 Mich 172, 185; 428 NW2d 335 (1988). Thus, we must ascertain and give effect to the intent of the drafter of the statute or administrative rule under review. *Collucci v McMillin*, 256 Mich App 88, 94; 662 NW2d 87 (2003). We start by reviewing the language of the administrative rule or statute. *Id.* If the language is unambiguous on its face, the drafter is presumed to have intended the meaning plainly expressed and further judicial interpretation is not permitted. *Id.*

Only where the language under review is ambiguous may a court properly go beyond the words of the statute or administrative rule to ascertain the drafter's intent. *Id.* In this regard,

> [a]n ambiguity of . . . language does not exist merely because a reviewing court questions whether the [drafter] intended the consequences of the language under review. An ambiguity can be found only where the language . . . as used in its particular context has more than one common and accepted meaning. Thus, where common words used in their ordinary fashion lead to one reasonable interpretation, [the language] cannot be found ambiguous. [*Id.*]

Where a statute or administrative rule is ambiguous, this Court will generally defer to the construction of the statute or administrative rule given by the agency charged with administering it. *Dignan, supra* at 576. However, this deference does not mean that a reviewing court abandons its ultimate responsibility to give meaning to statutes and administrative rules. *LCI Int'l Telecommunications Corp v Dep't of Commerce*, 227 Mich App 196, 205; 574 NW2d 710 (1997). We will not

defer to the administrative agency's interpretation of a rule where the language of the rule is unambiguous, *Koontz v Ameritech Services, Inc*, 466 Mich 304, 323-324; 645 NW2d 34 (2002), or we are convinced that agency's interpretation is "clearly wrong," *MEAPAC*, *supra* at 437.

### B. THE DEQ DID NOT VIOLATE RULE 603 BY ISSUING A PART 111 PERMIT TO EDS

Petitioners argue that the circuit court improperly engaged in unauthorized rule-making and effectively rewrote the language of Rule 603 when it affirmed the issuance to EDS of a Part 111 permit to construct a hazardous waste treatment facility in a wetland.[10] Rule 603 provides, in pertinent part, "(1) Active portions of new treatment, storage, or disposal facilities or expansions, enlargements, or alterations of existing facilities shall not be located in any of the following areas: . . . (f) In a wetland." Petitioners

---

[10] Preliminarily, we address two issues. First, petitioners argue that the circuit court erred in giving deference to the DEQ's interpretation of Part 111 and Rule 603. However, the circuit court specifically stated in its opinion and order that it did not give any deference to the DEQ's interpretation of Part 111. Therefore, petitioners' argument fails.

Second, EDS argues that this issue is moot because the wetlands on the Citrin Drive site have been eliminated. An issue becomes moot where a subsequent event renders it impossible for this Court to fashion a remedy. *In re Contempt of Dudzinski*, 257 Mich App 96, 112; 667 NW2d 68 (2003). The issue on appeal is not whether the DEQ properly granted EDS a Part 303 permit to fill the wetlands, but instead, whether the DEQ properly granted the Part 111 construction permit. Petitioners do not dispute that the DEQ properly granted the Part 303 permit or that EDS legally filled the wetlands. Instead, petitioners argue that the DEQ improperly granted EDS a Part 111 permit because wetlands existed on the site at the time the DEQ issued the Part 111 permit. EDS has not yet built the hazardous waste facility authorized by the Part 111 permit. Thus, the issue whether the DEQ properly granted the Part 111 construction permit to EDS is not moot, despite the fact that EDS has eliminated the wetlands.

argue that, by issuing the Part 111 permit to EDS on the basis of the fact that EDS had obtained a Part 303 permit to fill the wetlands, the DEQ created an exception to Rule 603(1)(f) that did not exist. We disagree.

The Part 303 permit the DEQ issued to EDS gave EDS permission to "[p]lace fill material in approximately 3.5 acres of wetland for the purpose of constructing buildings, roads, truck marshalling areas, and a stormwater pond for a deep injection well facility." Petitioners do not dispute that the Part 303 permit issued to EDS was valid and that EDS legally filled the wetlands on the Citrin Drive site for the purpose of building the facility. That the Citrin Drive site contained wetlands at the time the DEQ considered EDS's Part 111 application did not preclude the DEQ under Rule 603(1)(f) from granting the Part 111 permit. Nothing in Rule 603 provides that a Part 111 permit cannot be granted when a wetland exists on the site—Rule 603 only provides that active portions of the facility may not be located in a wetland. Therefore, the DEQ can issue a Part 111 permit when the wetlands on the site will be legally eliminated before construction of the facility. The Part 111 permit was issued with the expectation that EDS would first fill the wetlands as it was legally permitted to do pursuant to the Part 303 permit that it had obtained for the sole purpose of constructing a hazardous waste facility.

Rule 603 must be read in conjunction with Part 303, which forbids filling, dredging, draining, or constructing, operating, or maintaining any use or development in a wetland "[e]xcept as otherwise provided by this part or by a permit obtained from the department under sections 30306 to 30314 . . . ." MCL 324.30304.

Where, as here, a Part 303 permit to lawfully fill a wetland has issued, the plain language of Rule 603(1)(f) is not violated by the issuance of a Part 111 permit. Once wetlands are filled, they no longer exist.[11] Rule 603(1)(f) simply is not violated where a Part 111 permit is issued for construction on land formerly designated as a wetland.

Petitioners point to the fact that Rule 603 expressly enumerates certain exceptions, but subsection 1(f) does not contain any exceptions.[12] Petitioners argue that we ought not create an exception to subsection 1(f) by judicial fiat. Rule 603(1)(f) unambiguously provides that a treatment, storage, or disposal facility shall not be located in a wetland. Part 303 of the NREPA allows the elimination of a wetland with a permit, MCL 324.30306. Because Part 111 and Part 303 are both statutes included within the NREPA, we assume that, when the rule-makers enacted Rule 603, they were aware that a builder could obtain a permit to eliminate a wetland under Part 303. Cf. *Walen v*

---

[11] A wetland that has been filled or eliminated is no longer considered a "wetland" under the Michigan Administrative Code. The rules implementing Part 111 define a wetland for hazardous waste purposes as "the areas defined as wetlands in part 303 of the act [NREPA]." 1999 AC, R 299.9109(kk). Part 303 defines "wetland" as "land characterized by the presence of water at a frequency and duration sufficient to support, and that under normal circumstances does support, wetland vegetation or aquatic life, and is commonly referred to as a bog, swamp, or marsh . . . ." MCL 324.30301(d). Once a wetland is filled or eliminated in compliance with a Part 303 permit, it loses the characteristics of a wetland and is no longer a wetland.

[12] For example, Rule 603(1)(d) provides that active portions of new treatment, storage, or disposal facilities shall not be located over a sole-source aquifer "unless the director grants an exemption to this provision based upon a demonstration by the applicant that the treatment, storage, or disposal facility will be located, designed, constructed, and operated in a manner that will prevent contamination of the aquifer." Similarly, Rule 603(4) provides that treatment, storage, and disposal facilities shall not be located in a floodplain unless one of two delineated exceptions is met.

*Dep't of Corrections*, 443 Mich 240, 248; 505 NW2d
519 (1993) ("It is a well-known principle that the Leg-
islature is presumed to be aware of, and thus to have
considered the effect on, all existing statutes when
enacting new laws."). A Part 303 permit may author-
ize the draining, dredging, and filling of a wetland for
the purpose of constructing, operating, or maintaining
any use or development. There is nothing in Rule 603
that prohibits a treatment, storage, or disposal facility
from being located in an area that was *formerly* a
wetland but is no longer a wetland due to action
taken in compliance with a Part 303 permit. In order
to construe the rule the way petitioners propose, Rule
603(1)(f) would have to read, "(1) Active portions of
new treatment, storage, or disposal facilities or
expansions, enlargements, or alterations of existing
facilities shall not be located in any of the following
areas: . . . (f) In a wetland, *even if the wetland is
eliminated pursuant to a Part 303 permit.*" (Empha-
sis added.) Therefore, our interpretation of Rule 603
does not judicially create an exception to subrule
1(f). Rather, our interpretation of Rule 603(1)(f) is
dictated by the unambiguous language of that subsec-
tion. The fact that Rule 603(1)(f) does not contain any
express exceptions simply does not preclude the DEQ
from issuing a Part 111 permit to build a hazardous
waste facility in an area that was once a wetland.

We also find unpersuasive petitioners' argument
that, by interpreting Rule 603 to allow the DEQ to
issue a Part 111 permit in this case, the circuit court
violated the doctrine of *expressio unius est exclusio
alterius*. Under that doctrine, an express mention of
one thing in a statute generally implies the exclusion
of similar things that were not mentioned in the stat-

ute. *Houghton Lake Area Tourism & Convention Bureau v Wood*, 255 Mich App 127, 151; 662 NW2d 758 (2003). "The omission of a provision in one part of a statute, which is included elsewhere in the statute, should be construed as intentional." *Cherry Growers, Inc v Michigan Processing Apple Growers, Inc*, 240 Mich App 153, 170; 610 NW2d 613 (2000). Petitioners compare and contrast Rule 603 with 1999 AC, R 299.4416 (Rule 416), which governs the DEQ's issuance of permits to construct type II landfills under the NREPA. Rule 416 provides, in pertinent part, "A new type II landfill unit and a lateral extension of an existing unit shall not be located in wetlands, unless the owner and operator can demonstrate all of the following to the director: (a) The owner or operator has obtained a permit under part 303 of the act . . . ." Petitioners argue that, because Rule 416 expressly lists a wetland permit as part of an exception to when a type II landfill may be located in a wetland, but Rule 603(1)(f) does not list any exceptions to when a treatment, storage, or disposal facility may be located in a wetland, the acquisition of a Part 303 permit does not excuse a builder from the prohibition in Rule 603(1)(f) against locating a treatment, storage, or disposal facility in a wetland.

Because Rule 416 lists a Part 303 permit as part of an exception to when a person may locate a type II landfill unit in a wetland, and Part 603(1)(f) lists no such exception, we must assume that the rule-makers intended to omit such an exception in Rule 603(1)(f). Stated differently, Rule 416 provides the DEQ with discretion to allow construction of a type II landfill unit *in a wetland*. By contrast, Rule 603 does not provide the DEQ with discretion to allow construction of a haz-

ardous waste treatment, storage, or disposal facility *in a wetland.* We nonetheless conclude that Rule 603 does not prohibit construction on land formerly classified as a wetland.

Part 303 grants the DEQ the authority to permit a myriad of different activities, some of which authorize construction that would not alter the wetland. The fact that the DEQ issues a Part 303 permit does not necessarily mean that the wetland will be filled and will no longer exist. If, for instance, the DEQ had issued a Part 303 permit to EDS to build a facility at the site, but the permit did not authorize EDS to fill the wetlands, the DEQ would be precluded from issuing EDS a Part 111 permit to build the hazardous waste treatment facility because the proposed facility would still be in a wetland. A builder with a similar Part 303 permit would not be precluded from building a type II landfill unit in a wetland under Rule 416.

In this case, the Part 303 permit the DEQ issued to EDS allowed it to place fill material in the wetlands for the purpose of building the facility. Where the DEQ issues a Part 303 permit to fill and eliminate wetlands, the DEQ may also issue a Part 111 permit or allow an owner or operator to build a facility on land previously designated a wetland without violating Rule 603(1)(f). Simply put, the area that was once a wetland is no longer considered a wetland and, consequently, Rule 603(1)(f) does not apply. So, construing Rule 603(1)(f) to allow the DEQ to issue a Part 111 permit where EDS obtained a Part 303 permit to fill the wetlands does not, in light of the language of Rule 416, violate the doctrine of *expressio unius est*

*exclusio alterius.* The circuit court correctly concluded that Rule 603(1)(f) did not prohibit the DEQ from issuing a Part 111 permit in this case.

### C. THE DEQ WAS NOT REQUIRED TO CONSIDER NEED FOR THE FACILITY

#### 1. PART 111 DID NOT REQUIRE THE DEQ TO CONSIDER NEED BEFORE ISSUING A PART 111 PERMIT

Petitioners maintain that Part 111 required the DEQ to consider Michigan's need for a hazardous waste facility before issuing the Part 111 permit. Petitioners cite several sections of Part 111 in support of their argument. Addressing each of these sections in turn, we conclude that Part 111 did not require the DEQ to consider need for a facility before issuing a Part 111 permit.[13]

##### a. MCL 324.11107

MCL 324.11107 sets forth the purpose and methods of hazardous waste management under Part 111:

---

[13] Petitioners argue that the Legislature's intent to require the DEQ to consider whether Michigan had an overcapacity of hazardous waste facilities in issuing a Part 111 permit is apparent from the legislative history (specifically, the Senate Fiscal Agency Bill Analysis, SB 403-405, 413, November 17, 1987) of Part 111. However, because the language of Part 111 is unambiguous and clearly establishes that the DEQ is not required to consider need, we cannot resort to legislative history. *In re Certified Question from the United States Court of Appeals for the Sixth Circuit,* 468 Mich 109, 116; 659 NW2d 597 (2003).

The department[14] and the board[15], in the conduct of their duties as prescribed under this part, shall assist in encouraging, developing, and implementing methods of hazardous waste management that are environmentally sound, that maximize the utilization of valuable resources, and that encourage resource conservation, including source separation, recycling, and waste reduction, and that are consistent with the plan to be provided by the department of public health pursuant to section 12103(d) of the public health code, Act No. 368 of the Public Acts of 1978, being section 333.12103 of the Michigan Compiled Laws. In addition, the director, the department, and the board, in the conduct of their duties as prescribed by this part, shall assist in implementing the policy of this state to minimize the placement of untreated hazardous waste in disposal facilities.

This section of Part 111 merely outlines in general terms the DEQ's goals in fulfilling its duties. We therefore reject petitioners' claim that this statute imposes on the DEQ an obligation to consider whether a hazardous waste facility is needed before issuing a Part 111 permit.

### b. MCL 324.11110

MCL 324.11110 required the DEQ to update the Hazardous Waste Management Plan for Michigan (the original plan), which was adopted by the Natural Resources Commission in 1982. MCL 324.11110(1), MCL 324.11110(2)(a). Petitioners cite MCL

---

[14] Under the NREPA, the "department" is defined as "the director of the department of natural resources or his or her designee to whom the director delegates a power or duty by written instrument." MCL 324.301(b). However, Executive Order No. 1995-18 transferred environmental regulatory programs from the Department of Natural Resources to the newly created DEQ.

[15] Part 111 defines the "board" as a site review board. MCL 324.11102(1).

324.11110(2),[16] MCL 324.11110(3)(c),[17] and MCL 324.11110(4)[18] in support of their argument that the DEQ must consider need in making its decision

---

[16] MCL 324.11110 provides, in pertinent part:

(2) The updated plan shall:

\*   \*   \*

(b) Be based upon location of generators, health and safety, economics of transporting, type of waste, and existing treatment, storage, or disposal facilities.

(c) Include information generated by the department of commerce and the department on hazardous waste capacity needs in the state.

\*   \*   \*

(f) Plan for a reasonable geographic distribution of treatment, storage, and disposal facilities to meet existing and future needs, including proposing criteria for determining acceptable locations for these facilities. The criteria shall include a consideration of a location's geology, geography, demography, waste generation patterns, along with environmental factors, public health factors, and other relevant characteristics as determined by the department.

[17] MCL 324.11110(3) provides, in pertinent part:

The department shall instruct the office of waste reduction created in part 143 to complete studies as considered necessary for the completion of the updated plan. These studies may include:

\*   \*   \*

(c) A projection or determination of future hazardous waste management needs based on an evaluation of existing capacities, treatment or disposal capabilities, manufacturing activity, limitations, and constraints. Projection of needs shall consider the types and sizes of treatment, storage, or disposal facilities, general locations within the state, management control systems, and an identified need for a state owned treatment, storage, or disposal facility.

[18] MCL 324.11110(4) provides:

If the department finds in preparing the updated plan that there is a need for additional treatment or disposal facilities in the state, then the department shall identify incentives the state could offer that would encourage the construction and operation of additional treatment or disposal facilities in the state that are consistent with

whether to issue a Part 111 permit to build a hazardous waste facility. However, nothing in MCL 324.11110 requires the DEQ to consider need as a prerequisite to the issuance of a Part 111 permit. MCL 324.11110 simply requires the DEQ to consider need in terms of undercapacity in preparing the updated plan. MCL 324.11110 relates only to the preparation of the updated plan, and not to the DEQ's permitting decisions. Petitioners' reliance on MCL 324.11110 is therefore misplaced.

c. MCL 324.11115

MCL 324.11115 provides, in pertinent part, "After the updated plan is adopted, the department shall not issue a permit or license under this part for a treatment, storage, or disposal facility until the department has made a determination that the action is consistent with the updated plan." Petitioners argue that the updated plan required the DEQ to consider need in determining whether to allow another hazardous waste facility and that the DEQ's failure to consider need in issuing the Part 111 permit to EDS was inconsistent with the goal of the updated plan. We disagree.[19]

The updated plan sets forth its overriding policy recommendations as follows:

> The major overriding policy recommendation in the Plan is to support the existing designated hierarchy for waste

the updated plan. The department shall propose criteria which could be used in evaluating applicants for the incentives.

[19] As stated above, statutory mandates to consider need relate only to the preparation of the updated plan and do not apply to permitting decisions.

management practices, which is intended to best reduce
risks to human health and the environment. Source reduc-
tion of hazardous waste should remain the preferred alter-
native, followed in descending order by: reuse, closed-loop,
on-site, and off-site recycling; treatment, including incinera-
tion; and land disposal.

A second overriding policy recommendation in the Plan
is the recommendation that the Department of Natural
Resources (DNR) adopt a statewide policy goal of 50 percent
reduction in hazardous wastes released to all media within
five years of adoption of this Plan. This goal is not to be
applied to individual companies or industry sectors.

The Plan supports the current state policy position that
Michigan should rely upon private enterprise, rather than
state government, to develop necessary hazardous waste
management facilities and to propose environmentally and
economically sound sites, as regulated by the DNR.

Nothing in the updated plan's expressed overriding
policy recommendations supports petitioners' claim
that the DEQ must consider whether there exists a
need for a hazardous waste facility before issuing a
Part 111 permit.

Instead, the updated plan establishes a policy of
ensuring that there will be adequate hazardous waste
management capacity to meet the needs of Michigan.
Under the section entitled "Policies to Assure Ade-
quate Hazardous Waste Management Capacity," the
updated plan states:

> Michigan policy should support the general goal of
> achieving and maintaining sufficient hazardous waste man-
> agement capacity (at a variety of types of facilities) within
> the state to meet the needs of Michigan generators, without
> precluding the interstate transport of imports and exports.
> When feasible, this capacity should be located at multiple
> sites to provide stability in site availability.

The drafters of the updated plan clearly wanted to ensure that Michigan would not lack necessary hazardous waste facilities. Nothing in the updated plan implies that one of its goals is to avoid an overcapacity of facilities. In fact, the updated plan specifically reaffirms the original policy position that Michigan should rely on private enterprise to develop necessary hazardous waste management facilities and to propose environmentally and economically sound sites.[20] Although the updated plan states that the private enterprises should be regulated by the DNR, this does not imply that Michigan ought to preclude private enterprise from making its own determination regarding need for a facility.

Allowing private enterprise to determine whether there is need for new hazardous waste facilities is not contrary to the updated plan's goal of reducing risks to human health and the environment. New facilities can bring new treatment, storage, and disposal technologies to the state that are cheaper, more efficient, and better for the environment than older technologies. Facilities with this new technology would compete with older facilities and could force older facilities to update their methods or close down. Disallowing new facilities because there is a perceived "overcapacity" of facilities could stifle competition and allow facilities with older, less environmentally friendly technology to remain.

---

[20] The original plan provided that "the determination of facility location should remain the responsibility of the facility proposer" because, among other reasons, "[e]conomic conditions, based upon the location of generators and existing disposal facilities, and economic outlook for the particular industry to be served, will determine where facilities are needed and will create a reasonable distribution of sites."

Petitioners also argue that the DEQ's policy of following the market-driven approach to need is inconsistent with the updated plan's policy of waste reduction. However, there is nothing in the updated plan stating that the policy of waste reduction is met by requiring private enterprises to show undercapacity before obtaining a permit to build a new facility. We conclude that the updated plan does not require the DEQ to determine whether Michigan has an overcapacity of hazardous waste facilities.

d. MCL 324.11120

Next, petitioners argue that the DEQ was required to consider need in issuing a Part 111 permit to EDS, because MCL 324.11120(13)[21] required the SRB to consider the concerns and objections submitted by the public, which in this case included the claim that there was no need for this facility.[22] Here, because the public objected ˮthat the proposed facility was not needed because Michigan has ample hazardous waste treatment facilities, the SRB was required to consider

---

[21] MCL 324.11120(13) provides:

  The board also shall consider the concerns and objections submitted by the public. The board shall facilitate efforts to provide that the concerns and objections are mitigated by establishing additional stipulations specifically applicable to the treatment, storage, or disposal facility and operation at that site. Through deliberations, the board may modify the construction permit application in response to its findings. To the fullest extent practicable, the board also shall integrate by stipulation the provisions of the local ordinances, permits, or requirements.

[22] MCL 324.11120(12) lists factors that the SRB must consider before making a recommendation to the DEQ whether it should issue a Part 111 permit. Petitioners quote this statute, but do not argue that any of the factors listed in this section of the statute require the SRB to consider need.

the public's concern relating to whether the facility proposed by EDS was needed. The SRB fulfilled this obligation and, in fact, found merit to this public concern. The SRB recommended that the DEQ deny the Part 111 permit to EDS, in part because the facility was not needed. Despite the fact that MCL 324.11120 required the SRB to consider need in this case, it does not similarly require the DEQ to consider the concerns of the public in making its permitting decisions.[23] Thus, the DEQ's act of following the market-driven approach to need was not inconsistent with the MCL 324.11120(13) requirement that the SRB consider the concerns of the public, which included need in this case. Furthermore, although the SRB found merit to the public's concern that there was not need for the facility, there is nothing in MCL 324.11120 requiring the DEQ to accept the SRB's recommendations regarding the public's concerns.

### 2. OTHER NREPA STATUTES DID NOT REQUIRE THE DEQ TO CONSIDER NEED IN ISSUING A PART 111 PERMIT

Petitioners also argue that the Legislature's intent to require the DEQ to consider whether Michigan had an overcapacity of hazardous waste facilities in issuing a Part 111 permit is apparent from other statutes concerning pollution and waste reduction. Petitioners first cite MCL 324.14302 and MCL 324.14303 from Part 143 (waste minimization) of the Pollution Prevention

---

[23] In fact, the DEQ did address the public's argument that the Part 111 permit should not be issued to EDS because the facility was not needed. The DEQ explained in its Responsiveness Summary that the evidence that the facility was not needed was faulty and that, in any event, the DEQ was not required to consider need for the facility, but instead followed a market-based approach to need.

chapter of the NREPA. MCL 324.14302 requires the DEQ to incorporate pollution prevention goals within its permit programs.[24] MCL 324.14303 requires the DEQ to take several delineated actions to encourage pollution prevention.[25] These statutes do not mention need and do not imply that the DEQ should consider need whenever granting any type of permit.

---

[24] MCL 324.14302 provides:

(1) The department shall incorporate pollution prevention goals within its regulatory and permit programs, including data collection and analysis to advance the concept and implementation of pollution prevention.

(2) The department shall employ personnel and provide support staff as are necessary to implement this part.

[25] MCL 324.14303 provides:

(1) The department shall do all of the following:

(a) Identify opportunities to encourage pollution prevention through the department's regulatory programs.

(b) Identify opportunities to encourage pollution prevention through the department's permit programs.

(c) Identify how pollution prevention efforts should be documented in environmental impact statements.

(d) Analyze and make recommendations on the value of imposing statewide goals or goals for particular environmental wastes, or both, for pollution prevention, minimum recycling standards, and environmental waste treatment standards.

(e) Publish an annual analysis of pollution prevention efforts and potentials in the state.

(2) In performing its responsibilities under subsection (1), the department shall place a particular emphasis on in-plant pollution prevention.

(3) Consistent with the congressional declaration in section 1003(b) of subtitle A of the solid waste disposal act, title II of Public Law 89-272, 42 U.S.C. 6902, that it is the national policy of the United States that, wherever feasible, hazardous waste is to be reduced or eliminated as expeditiously as possible, the department shall place a particular emphasis on the prevention of an environmental waste that is a hazardous waste as defined in section 11103.

Petitioners also cite MCL 324.14501 *et seq.*, which is Part 145 (waste reduction assistance) of the Pollution Prevention chapter of the NREPA. In general, this part of the NREPA requires the department to "inform, assist, educate, and provide funding . . . to persons to facilitate a reduction in the amount of environmental waste generated in the state." MCL 324.14502(1). Again, this part of the NREPA does not mention need and does not imply that the DEQ should consider need whenever granting any type of permit.

### D. THE DEQ WAS NOT REQUIRED TO PROMULGATE A RULE ADOPTING ITS MARKET-DRIVEN APPROACH TO NEED

Petitioners initially argue that the DEQ's failure to promulgate any rules to implement the updated plan requires reversal of the DEQ's decision to issue a Part 111 permit to EDS.[26] Petitioners further argue that the DEQ's market-driven approach to need constitutes a "rule," because it is a fundamental policy that prescribes the DEQ's procedures and practice regarding the permitting, location, number, and need for hazardous waste facilities in Michigan. Whether an agency's policy is invalid because it was not promulgated pursuant to the procedures of the APA is a question of law subject to de novo review. *Faircloth v*

---

[26] MCL 324.11114 provides: "Not more than 180 days after the final adoption of the updated plan, the department shall submit to the legislature proposed rules to implement the updated plan created in section 11110." Apart from a rule regarding the DEQ's market-driven approach to need, petitioners do not specify any DEQ policy that was used in issuing the Part 111 permit to EDS that should have been promulgated as a rule. We will not invalidate the DEQ's entire permitting process and the permits the DEQ issued under that process, including EDS's Part 111 permit, on the basis of alleged unspecified unpromulgated policies the DEQ follows in deciding whether to issue Part 111 permits.

*Family Independence Agency*, 232 Mich App 391, 401; 591 NW2d 314 (1998).

"[A]n administrative agency cannot rely upon a guideline or unpromulgated policies in lieu of rules promulgated under the APA." *Dep't of Natural Resources v Bayshore Assoc, Inc*, 210 Mich App 71, 85-86; 533 NW2d 593 (1995). The APA requires administrative agencies to follow certain specified procedures for promulgating rules, including the requirements of notice and a hearing. MCL 24.241.

> "The APA requires an agency to give notice of proposed rules or rule changes, to hold a public hearing, and to submit the proposed rule or rule changes to the Legislature's Joint Committee on Administrative Rules for review and approval." *AFSCME v Dep't of Mental Health*, 452 Mich 1, 9 n 8; 550 NW2d 190 (1996). An agency's failure to follow this process renders the rule invalid. [*Faircloth, supra* at 402.]

In *American Federation of State, Co & Municipal Employees (AFSCME) v Dep't of Mental Health*, 452 Mich 1, 8; 550 NW2d 190 (1996), the Supreme Court, quoting MCL 24.207, set forth what constitutes a "rule" that must be promulgated pursuant to the APA:

> [A] "rule" is: (1) "an agency regulation, statement, standard, policy, ruling, or instruction of general applicability," (2) "that implements or applies law enforced or administered by the agency, or that prescribes the organization, procedure, or practice of the agency . . . ."

However, a "rule" does not include, inter alia, "[a] decision by an agency to exercise or not to exercise a permissive statutory power, although private rights or interests are affected." MCL 24.207(j).

We conclude that the DEQ's market-driven approach to need does not constitute a "rule" under MCL

24.207(j). As discussed previously in Section II(C) of this opinion, the DEQ is not required to consider need for a hazardous waste facility before issuing a Part 111 permit to build such a facility. Further, in issuing the Part 111 permit to EDS, the DEQ's action was consistent with the updated plan's express policy that Michigan should rely on private enterprise to propose and develop hazardous waste facilities. As stated by the DEQ, its market-driven approach to need is merely a way of indicating that it will not affirmatively consider whether there is a need for a hazardous waste facility in deciding whether to issue a Part 111 permit. We agree with the circuit court that not every action or nonaction by the DEQ requires an administrative rule to be promulgated before the DEQ can act. Logically, an agency cannot be required to promulgate a rule regarding everything that it will *not* consider before issuing a permit. If this were the case, an agency would never be able to take any action.

Under MCL 24.207(j), "[a] decision by an agency to exercise or not to exercise a permissive statutory power, although private rights or interests are affected," is not considered a "rule" that must be promulgated under the APA's procedural requirements. Because Part 111 does not require the DEQ to develop standards for its Part 111 permit decisions or to consider need for a particular facility when making its Part 111 permitting decisions, the DEQ's decision not to consider need is a decision not to exercise a permissive statutory power. Thus, the DEQ's market-driven approach to need is not a "rule" under MCL 24.207(j).[27] The circuit court correctly determined that

---

[27] As in *Michigan Trucking Ass'n v Public Service Comm (On Remand)*, 225 Mich App 424, 430; 571 NW2d 734 (1997), this conclusion is

the DEQ properly issued the Part 111 permit to EDS, even though the DEQ did not promulgate a rule that it would not consider need for a facility when making its Part 111 permitting decisions.

### E. THE DEQ'S DECISION TO ISSUE THE PART 111 PERMIT TO EDS WAS SUPPORTED BY COMPETENT, MATERIAL, AND SUBSTANTIAL EVIDENCE

Petitioners argue that the circuit court erred in failing to make its own review of the record to determine whether the DEQ's decision to issue the Part 111 permit to EDS was supported by competent, material, and substantial evidence. Petitioners argue that the circuit court improperly relied on the DEQ's Fact Sheet and Responsiveness Summary instead of reviewing the whole record in reaching its decision to issue the Part 111 permit to EDS. In reviewing an administrative agency's decision for competent, material, and substantial evidence, the circuit court must consider "the whole record—that is, both sides of the record—not just those portions of the record supporting the findings of the administrative agency." *Michigan Employment Relations Comm v Detroit Symphony Orchestra, Inc*, 393 Mich 116, 124; 223 NW2d 283 (1974). Here, the circuit court concluded that it could not "disregard [the DEQ's] fact sheet and summary, which is supported by material, substantial and competent evidence." Petitioners argue, on the basis of this statement, that the circuit court failed to review both sides of the record. We disagree. .

---

buttressed by the fact that Part 111 does not expressly require the DEQ to promulgate permit standards before implementation.

There is nothing in the circuit court's statement implying that it *only* relied on the DEQ's Fact Sheet and Responsiveness Summary in reaching its decision. Rather, the circuit court's statement implies that it went beyond the DEQ's Fact Sheet and Responsiveness Summary and reviewed all the other evidence before reaching a determination that the conclusions and statements in the DEQ's Fact Sheet and Responsiveness Summary were supported by this other evidence. Furthermore, the circuit court merely stated that it "cannot disregard" the DEQ's Fact Sheet and Responsiveness Summary. The circuit court was correct that it could not disregard the DEQ's Fact Sheet and Responsiveness Summary, just as it could not disregard the other approximately 34,000 pages of documents, because these documents were part of the administrative record. Petitioners offer no other support for their claim that the circuit court ignored evidence supporting their position. There is no indication that the circuit court " 'misapprehended or grossly misapplied the substantial evidence test to the agency's factual findings.' " *Dignan, supra* at 575, quoting *Boyd, supra* at 234.

Next, petitioners argue that the circuit court clearly erred in determining that the DEQ's decision to issue the Part 111 permit was supported by competent, material, and substantial evidence on the whole record. Petitioners argue that the DEQ gave the SRB recommendation, at most, a cursory and superficial review, and disregarded the SRB recommendation without any support on the record. Petitioners contend that it was the SRB's recommendation to deny EDS's application for the Part 111 permit that was supported by the evidence.

There is no indication that the circuit court grossly misapplied the substantial evidence test in reviewing the DEQ's decision to issue the Part 111 permit to EDS. The circuit court considered the evidence in the administrative record and concluded that the DEQ's findings in the Fact Sheet and Responsiveness Summary were supported by the evidence. The circuit court correctly concluded that the record evidence supported the DEQ's findings. Petitioners do not explain which sections of the DEQ's Fact Sheet and Responsiveness Summary are not supported by the evidence or are erroneous, and do not point to any evidence to refute the findings made by the DEQ. In the absence of a more specific allegation of error, we conclude that the circuit court did not clearly err in determining that the DEQ's decision to issue the Part 111 permit to EDS was supported by competent, material, and substantial evidence.

Petitioners also argue that the circuit court erred in affirming the DEQ's decision to issue a Part 111 permit to EDS because, even under the DEQ's market-driven approach to need, there was not substantial, competent, and material evidence that the market would support another hazardous waste facility. We disagree. As previously stated, it is up to private enterprise, not the DEQ, to assess the market by looking at the locations of existing facilities, competition, economic trends, available technology, and more, and then take the initiative to develop new facilities. It is the permit applicant who takes the economic risk and assesses whether there is a viable market for the proposed facility. A permit applicant simply does not need to show that the market will support a new hazardous waste facility.

## F. THE DEQ'S DECISION TO ISSUE THE PART 111 PERMIT TO EDS WAS NOT ARBITRARY OR CAPRICIOUS

Petitioners argue that the DEQ acted arbitrarily and capriciously in issuing the Part 111 permit because it had previously concluded that Rule 603(1)(f) precluded it from issuing a Part 111 permit to EDS due to the existence of wetlands on the Citrin Drive site. We find no merit to petitioners' claim. Several internal e-mails exchanged between DEQ employees discussed whether Rule 603 precluded the issuance of a Part 111 permit to EDS to build a hazardous waste facility on the Citrin Drive site due to the existence of wetlands. The authors of these e-mails reach no definitive conclusion regarding the issue, but merely acknowledge the possibility that, because wetlands exist on the site, it might be argued that Part 111 prohibits the DEQ from issuing a construction permit to EDS even if EDS were to obtain a Part 303 permit to fill the wetlands. These e-mails are merely part of informal discussions among DEQ employees and are not official agency conclusions. These internal e-mails do not demonstrate that the DEQ officially concluded that it lacked the authority to issue a Part 111 permit to EDS. There is no support for petitioners' argument that the DEQ secretly concluded that it could not legally issue a Part 111 permit to EDS, but did so in any event, in contravention of this conclusion.

Petitioners also argue that the DEQ's decision to issue the Part 111 permit to EDS was arbitrary and capricious because, despite the fact that the DEQ internally recognized the validity of the SRB's reasons for recommending to deny the permit, the DEQ later publicly denied the legitimacy of those reasons when issuing the Part 111 permit to EDS. In support of their

argument, petitioners point to an internal DEQ briefing paper submitted by Steven R. Sliver, an Environmental Engineer Specialist for the Waste Management Division of the DEQ, regarding EDS's application for the Part 111 permit. In this briefing paper, Sliver stated, "Most of the concerns raised by the SRB in its recommendation for denial are valid, and can be the basis for the Department to either deny the permit or to issue the permit with special conditions that mitigate the SRB's concerns." At the end of the paper, Sliver recommended that the DEQ take the following action:

> The draft decision for the construction permit should await the decision on the wetland permit. If the wetlands permit is denied, then the construction permit must be denied, too. Construction in a wetlands is prohibited by Part 111 of Act 451.
>
> If the wetlands permit is issued, then the Department must decide whether to issue or deny the construction permit for the Citrin Drive site. The permit can be issued with special conditions that eliminate or minimize the legitimate adverse impacts identified by the SRB.

This briefing paper does not demonstrate that the DEQ internally agreed with the SRB's recommendation that EDS's Part 111 permit application should be denied. In fact, the DEQ briefing paper only shows that Sliver found that some of the SRB's recommendations had merit, but could be eliminated or mitigated through special permit conditions. When the DEQ later issued the Part 111 permit to EDS, it followed Sliver's recommendations. The DEQ waited for EDS to acquire a Part 303 permit and then issued a Part 111 permit to EDS, which contained special conditions intended to eliminate or minimize the legitimate adverse effects identified by the SRB. Therefore, we find no merit in peti-

tioners' contention that the DEQ's issuance of the permit was contrary to a finding that the SRB's reasons for recommending to deny the permit were valid.

### III. CONCLUSION

We conclude that the circuit court did not err in affirming the DEQ's decision to issue a Part 111 permit to EDS because: (1) the DEQ did not violate Rule 603 by issuing the Part 111 permit to EDS; (2) the DEQ was not required to consider whether there was a need in Michigan for an additional hazardous waste facility when issuing the Part 111 permit to EDS; (3) the DEQ was not required under the APA to promulgate a rule establishing that it would not consider whether Michigan needed an additional hazardous waste facility when issuing a Part 111 permit to construct such a facility; and (4) the DEQ's decision to issue a Part 111 permit to EDS was supported by competent, material, and substantial evidence and was not arbitrary or capricious.

Affirmed.