*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

SIERRA CLUB,

        Appellant,

v

DEPARTMENT OF ENVIRONMENT, GREAT
LAKES, AND ENERGY, and DIRECTOR OF THE
DEPARTMENT OF ENVIRONMENT, GREAT
LAKES, AND ENERGY,

        Appellees,

and

DTE ELECTRIC COMPANY,

        Intervening Appellee.

UNPUBLISHED
January 7, 2021

No. 350083
Ingham Circuit Court
LC No. 18-000726-AA

Before: STEPHENS, P.J., and SERVITTO and LETICA, JJ.

PER CURIAM.

Appellant, Sierra Club, appeals as of right the trial court's order affirming the Department of Environment, Great Lakes, and Energy's (EGLE) decision to issue a permit to DTE Electric Company (DTE), which allowed DTE to construct a natural gas-fired power facility in St. Clair County. We affirm in part, reverse in part, and remand to the trial court for proceedings consistent with this opinion.

## I. BACKGROUND

-1-

This matter stems from DTE's request for a permit from the EGLE[1] that would allow DTE to construct a natural gas-fired power plant ("the Plant") in St. Clair County next to where an older, coal-fired power plant currently exists. The new power plant would eventually allow the retirement of the older plant. Because the Plant would be emitting pollution, in order to obtain the permit to build it, DTE was required to follow strict regulations, contained in the federal Clean Air Act (42 USC § 7470 et seq.) and the Michigan Natural Resources and Environmental Protection Act (MCL 324.5501 et seq.), concerning air quality and pollution controls.

DTE submitted its permit application on January 23, 2018. The application explained that DTE sought to construct and operate the Belle River Combined Cycle plant on an undeveloped property site, adjacent to the current DTE Belle River Power Plant and the DTE St. Clair Power Plant in St. Clair County. Both existing power plants are under one existing renewable operating permit. According to the application, the Plant site is in an area currently designated as non-attainment[2] for the sulfur dioxide[3] National Ambient Air Quality (NAAQS) standard and unclassifiable or in attainment with respect to NAAQS standards for all other pollutants. The application stated that sulfur dioxide emissions would be controlled through the use of pipeline-quality natural gas as the sole fuel source for the combustion turbine generators. DTE stated in its application that the Plant would be in compliance with the NAAQS, all applicable New Source Performance Standards, and the National Emissions Standards for Hazardous Air Pollutants.

In the permit application, DTE also stated that potential annual emissions from the Plant, which it apparently thought would be considered a new build, were estimated using specifically identified worst-case scenario assumptions. In those assumptions, DTE estimated sulfur dioxide emissions of approximately 28.65 tons per year using one combustion turbine generator, and 57.29 tons per year using two combustion turbine generators. With an additional .46 tons per year from ancillary equipment, DTE estimated a total potential of 57.75 tons of sulfur dioxide emissions per year as its worst-case scenario. Notably, a Plant (or project) is considered to have a significant net increase, or potential to emit, sulfur dioxide if the emission would equal or exceed 40 tons per year. Mich Admin R 336.2901(hh)(i)(B). Thus, the permit application for DTE's Plant indicates that the Plant is located in a nonattainment area and would be subject to nonattainment review regarding the emission of sulfur dioxide.

On January 29, 2018, the EGLE sent DTE a letter concerning its January 23, 2018 application for permit to install. In the letter, the EGLE stated that the application was incomplete and thus not approvable, as it did not address the nonattainment requirements for sulfur dioxide required by part 19 of Michigan Air Pollution Regulations. The letter further stated that the proposed Plant is considered a major source of sulfur dioxide and that the proposed increased sulfur dioxide emissions of 57.75 tons per year is greater than the 40-ton threshold for a significant net increase, and that the Plant is not considered a new build, but instead is a major modification

---

[1] At the time of its submission, the EGLE was known as the Department of Environmental Quality (DEQ). The name of the DEQ was changed to the EGLE per Executive Order 2019-06 (issued February 20, 2019).

[2] In essence, failure of compliance with the standard for the stated pollution.

[3] SO2

at an existing major stationary source.  That determination was based on "common ownership of all facilities, the same NAICS [North American Industry Classification System] code, and that the proposed facility is located adjacent to the existing major stationary source."  The letter indicated that the Plant is subject to part 19 of the Michigan Air Pollution Control Regulations and that in order to complete the application:

> a best available control technology (BACT) analysis is needed for particulate matter (PM), particulate matter less than or equal to 10 microns in diameter (PM10), and particulate matter less than or equal to 2.5 microns in diameter (PM2.5) for the proposed mechanical cooling towers.

> Also needed to complete the application is a pre-construction monitoring for all pollutants subject to prevention of significant deterioration (PSD) review.

The EGLE stated that DTE could resubmit its application when the required information is available.

DTE submitted additional information to the EGLE on February 19, 2018.  DTE stated that:

> Based on a review of the sulfur content of natural gas, the highest value that DTE's gas lab has monitored since 2001 was 0.281 gr/100 dscf[4] (See attached letter from DTE Gas Laboratory Services). This is significantly lower than the 0.5 gr/100 dscf value that was used as the fuel sulfur content for developing project scope and equipment specifications. Additionally, EPA's AP-42 emission factors are based on 2,000 grains/million scf[5], which equates to 0.2 g/100 scf.

> Based on the analyzed sulfur content data, adjustments have been applied to PTE S02 emission rates. These adjustments reduce PTE S02 emissions below the threshold of 40 tons per year. The revised PTE is included as Attachment B to this submittal and natural gas fuel sulfur content analysis recently obtained by DTE is provided as Attachment C.

> DTE proposes a limit for natural gas sulfur content of 0.34 gr/100 dscf on an annual basis to allow for possible short-term anomalies during any required testing.

With respect to the requirement of pre-construction monitoring, DTE requested a waiver.  It stated that:

> The PSD regulations require that a PSD permit application establish existing air quality levels. The determination of existing air quality levels can be satisfied by air measurements from an existing representative monitor, by an on-site monitoring

---

[4] Dry Standard Cubic Foot

[5] Standard Cubic Foot

program, or by demonstrating that modeled impacts are de minimis, as defined by Significant Monitoring Concentrations (SMCs).

Representative ambient air quality monitoring data exist in the vicinity of the [P]lant. The data were summarized and used in the air quality analysis presented in the *Permit to Install: Prevention of Significant Deterioration Application* submitted to the Michigan Department of Environmental Quality (MDEQ) in January 2018.

Also described in the PTI application, dispersion modeling analyses for the [P]lant were conducted in accordance with the United States Environmental Protection Agency's (USEPA's) Guideline on Air Quality Models (JSEPA 2017) and MDEQ's March 3, 2015 Air Quality Division Policy and Procedure: Dispersion Modeling Guidance for Federally Regulated Pollutants (AQD-22). The USEPA-recommended AERMOD modeling system (vi 621 6r) was used to conduct the dispersion modeling.

The air dispersion modeling was conducted for the range of expected operating scenarios, including startup/shutdown (SU/SD) of the combustion turbine generators (CTGs), to capture worst-case potential impact concentrations from the proposed plant. The [P]lant operating scenarios that were evaluated in the dispersion modeling analysis are described below.

   • Worst-case operating conditions for the two CTGs with the heat recovery steam generators (HRSGs) with duct burners in combination with the ancillary equipment (emergency generator and fire pump). If worst-case was determined to be during SU/SD conditions, then the auxiliary boiler was also operating for a 4-hour period to assist with the SU/SD.

   • Auxiliary boiler operating at full load for 24 hours with the two gas heaters. The CTGs/HRSGs are not operating in this scenario. As shown in Table 2, maximum AERMOD-modeled impacts across all scenarios for the [P]lant will be well below the SMCs for all pollutants.

***

Subsequent USEPA guidance indicates that existing air quality monitoring data, if deemed representative, can be used to satisfy preconstruction monitoring requirements.

Selection of representative air quality monitoring sites considers proximity to the [P]lant site, and comparison of the monitoring site environment to the environment surrounding the plant site. The PM2.s monitoring data are based on measurements collected by the USEPA at the monitor located at 2525 Dove Road, Port Huron, Michigan (St. Clair County, AQS 10 26-147-0005). The monitor reports values for both the 98th percentile 24-hour and annual averaging periods consistent with other monitors within the Detroit-Warren-Dearborn Core Based Statistical Area. Similar to the proposed [P]lant location, this monitor is located on the west side of the St. Clair River. It is within the same county approximately 12 miles north of the

proposed [P]lant site with very little variation in terrain elevation between the monitor site and the plant site. The monitor is located in the southwest region of Port Huron, which is an area that is more densely populated than the plant site and surrounding area, making the monitoring data conservatively representative. Therefore, the PM2.s measurements from the Port Huron monitor were selected as representative of background concentrations for the proposed [P]lant.

The proposed background PM2.s (24-hour and annual average) are based on three-year average (2014-2016) design values and are presented in Table 3. There is ample margin between the existing ambient air quality in the vicinity of the proposed [P]lant and the National Ambient Air Quality Standard (NAAQS) to support development in this area.

***

Therefore, in lieu of gathering pre-construction monitoring data for background ambient air concentrations, the observed concentration data from the local ambient air quality monitor presented in Table 3 are proposed.

Therefore, based on the modeling and monitoring data presented above, DTE respectfully requests that PSD pre-construction monitoring requirement be waived for the [P]lant for N02[6], CO[7], S02, and PM10[8] and that the existing PM25 monitoring data from the Port Huron monitor cited above be accepted as representative and, thus, satisfy the pre-construction monitoring requirement for PM2.5.

DTE attached a revised potential to emit to its letter showing 19.48 tons of sulfur dioxide emissions per year for one combustion turbine generator, 38.96 tons for two combustion turbine generators, and a total of 39.42 tons of sulfur dioxide emissions per year for the Plant. It also attached a sulfur analysis of natural gas fuel showing the sulfur content taken from periodic readings.

On June 11, 2018 the EGLE sent DTE a letter citing: 40 CFR 52.21(m)(a/b)(iii-iv), in which the EPA requires one year of continuous air monitoring data for each pollutant to be emitted in a significant amount at a major source; Mich Admin Code R 336.2813, which mirrors the EPA regulation; and, 40 CFR 51, Appendix W (adopted by reference in Michigan Air Pollution Control Rules) which allows for the use of existing regional data, if representative, as an alternative to requiring additional onsite preconstruction monitoring data. The EGLE concluded:

Based upon the modeling results, nitrogen dioxide and particulate matter had significant impacts and required background concentrations to complete your National Ambient Air Quality Standard impact analysis. All other criteria

---

[6] Nitrogen Dioxide

[7] Carbon Monoxide

[8] Particulate matter

pollutants yielded insignificant impacts and did not require any additional refined modeling.

A review of available regional data from similar geographical and demographic monitor sites has identified representative monitors and associated background concentrations suitable for use in your application analysis.

As such, the DEQ grants DTE Belle River's request for a preconstruction monitoring waiver and will not require any additional ambient monitoring to complete the required air quality analysis. Should DTE Belle River choose to conduct independent monitoring, that data may be substituted upon the completion of validation by AQD staff.

Sierra Club sent a lengthy list of concerns and comments to the EGLE and urged the EGLE not to finalize the permit.

On July 16, 2018, DTE responded to the comments and concerns posed by Sierra Club and, on July 18, 2018, the EGLE issued the permit to DTE. Sierra Club appealed the EGLE's issuance of the permit (a final agency decision) in the Ingham Circuit Court, as it was permitted to do under MCL 324.5505(8)[9] and MCL 600.631[10].

In its circuit court appeal, Sierra Club contended that the EGLE acted contrary to law in issuing the permit because it did not require DTE to satisfy the requirements for constructing a new emission unit that has the potential to increase air pollution by more than the 40 tons per year of sulfur dioxide emissions allowed. Sierra Club also argued that the EGLE's determination that the ambient background air quality data provided by DTE was representative of air quality in the area where the Plant would be constructed was arbitrary and capricious, and that the EGLE acted contrary to law when it approved the permit despite DTE's failure to submit an analysis of ambient ozone levels in the area that the Plant would affect.

---

[9] "Any person may appeal the issuance or denial by the department of a permit to install, a general permit, or a permit to operate authorized in rules promulgated under subsection (6), for a new source in accordance with section 631 of the revised judicature act of 1961, 1961 PA 236, MCL 600.631. Petitions for review shall be the exclusive means to obtain judicial review of such a permit and shall be filed within 90 days after the final permit action, except that a petition may be filed after that deadline only if the petition is based solely on grounds arising after the deadline for judicial review. Such a petition shall be filed no later than 90 days after the new grounds for review arise. Appeals of permit actions for existing sources are subject to section 5506(14)."

[10] "An appeal shall lie from any order, decision, or opinion of any state board, commission, or agency, authorized under the laws of this state to promulgate rules from which an appeal or other judicial review has not otherwise been provided for by law, to the circuit court of the county of which the appellant is a resident or to the circuit court of Ingham county, which court shall have and exercise jurisdiction with respect thereto as in nonjury cases. Such appeals shall be made in accordance with the rules of the supreme court."

The EGLE conceded that the modification to the DTE Plant has the *potential* to emit sulfur dioxide in amounts greater than 40 tons per year, but explained that the pertinent regulations applicable to a major modification permit allowed a "synthetic minor limit" on sulfur dioxide emissions to less than 40 tons per year and this limit is enforceable as a practical matter. According to the EGLE, a "synthetic minor limit" allows a major emitting source (such as the Plant) that has the potential to exceed the 40 tons per year sulfur dioxide emissions limitation to accept a legally enforceable restriction to keep its emissions below the 40 ton per year limit, which would allow DTE to be in compliance with relevant regulations. According to the EGLE, DTE's permit request was, in fact, in compliance with the air pollution regulations and requirements (including that of Mich Admin R 336.1205 concerning Michigan's air pollution control rules) as a synthetic minor permit.

As to ambient background air quality, the EGLE responded that DTE demonstrated that its emissions do not cause or contribute to an exceedance of ambient air quality standards. In doing so, DTE properly used off-site monitors to establish the background concentration of air pollutants and thus used data that is representative of the air quality in the vicinity of the new Plant. Finally, the EGLE responded that DTE provided the proper analysis and testing concerning ozone. EGLE reviewed the analysis, and determined that the ozone impact from the proposed Plant was less than that allowable and was not expected to cause or contribute to any violation of the ozone standards prior to issuing the permit. DTE also responded to the Sierra Club's appeal as an intervening appellee, essentially echoing the EGLE's position.

The lower court held oral arguments on the Sierra Club's appeal and thereafter issued a written opinion and order affirming the EGLE's decision to issue the permit. Sierra Club now appeals that decision.

## II. MONITORING, RECORDKEEPING, AND REPORTING REQUIREMENTS

On appeal, Sierra Club first argues that the EGLE did not establish sufficient monitoring, recordkeeping, and reporting requirements in the permit to ensure that the restriction on the Plant's potential to emit sulfur dioxide is legally and practically enforceable. We disagree.

We apply "multiple standards of review in an appeal from a circuit court's review of an administrative agency's decision." *City of Romulus v. Michigan Dep't of Environmental Quality*, 260 Mich App 54, 62; 678 NW2d 444 (2003). While great deference is accorded to the circuit court's review of factual findings, substantially less deference, if any, is accorded to the circuit court's decisions on matters of law. *Id.* When reviewing the circuit court's decision, this Court is to determine "whether the lower court applied correct legal principles and whether it misapprehended or grossly misapplied the substantial evidence test to the agency's factual findings." *Dignan v Michigan Pub Sch Employees Ret Bd*, 253 Mich App 571, 575; 659 NW2d 629 (2002).

The federal Clean Air Act requires the Environmental Protection Agency (EPA) to set National Ambient Air Quality Standards (NAAQS) for various emissions that are considered air pollutants. 42 USC § 7409; *Wolverine Power Coop v DEQ*, 285 Mich App 548, 555; 777 NW2d 1 (2009). The federal Clean Air Act also requires states to regulate air emissions. 42 USC § 7407; *Wolverine Power Coop*, 285 Mich App at 555. Michigan has done so through Michigan's Natural

Resources and Environmental Protection Act (NREPA), MCL 324.20101 *et seq*. Specifically, in part 55 of that Act, set forth at MCL 324.5501 *et seq*. "The NREPA delineates air emissions requirements and authorizes the [EGLE] to promulgate rules governing permits to install facilities that produce air emissions." *Wolverine Power Coop*, 285 Mich App at 555 (emphasis removed). Michigan has also set forth rules governing air pollution control in the Michigan Administrative Code, Rule 336.1101, *et seq*.

Under the Clean Air Act's program, designed to prevent the significant deterioration of air quality, a major facility that emits air pollution (such as the one at issue) must obtain a permit before it can install a modification to that facility. 42 USC § 7475; 42 USC § 7479. "Michigan's regulatory scheme, which operates somewhat differently [from the Clean Air Act, also] requires certain facilities to obtain a permit before installing a major modification." *Natural Resources Defense Council v Dept of Environmental Quality*, 300 Mich App 79, 90; 832 NW2d 288 (2013). Indeed, MCL 324.5505 provides, in relevant part:

> (1) Except as provided in subsection (4), a person shall not install, construct, reconstruct, relocate, alter, or modify any process or process equipment without first obtaining from the department a permit to install, or a permit to operate authorized pursuant to rules promulgated under subsection (6) if applicable, authorizing the conduct or activity.

> (2) The department shall promulgate rules to establish a permit to install program to be administered by the department. Except as provided in subsections (4) and (5), the permit to install program is applicable to each new or modified process or process equipment that emits or may emit an air contaminant.

> ***

> (4) The department may promulgate rules to provide for the issuance of general permits and to exempt certain sources, processes, or process equipment or certain modifications to a source, process, or process equipment from the requirement to obtain a permit to install or a permit to operate authorized pursuant to rules promulgated under subsection (6). However, the department shall not exempt any new source or modification that would meet the definition of a major source or major modification under parts C and D of title I of the clean air act, 42 USC 7470 to 7515.

The EGLE has established rules regarding the permitting process, as allowed for in the above statute. The permitting process requires the owner of a proposed project to submit information required by the EGLE on the application form, including descriptions of all reasonably anticipated air contaminants, a description of how air contaminant emissions will be controlled or minimized, and data demonstrating that emissions from the project will not have an unacceptable air quality impact in relations to federal, state, and local air quality standards. Mich Admin Code R 336.1203. Relevant to the instant matter, Mich Admin Code R 336.1205 provides that the EGLE shall not approve a permit unless two requirements have been met:

(a) The permit to install contains emission limits that are enforceable as a practical matter. An emission limit restricts the amount of an air contaminant that may be emitted over some time period. The time period shall be set in accordance with the applicable requirements and, unless a different time period is provided by the applicable requirement, should generally not be more than 1 month, unless a longer time period is approved by the department. A longer time period may be used if it is a rolling time period, but shall not be more than an annual time period rolled on a monthly basis. If the emission limit does not reflect the maximum emissions of the process or process equipment operating at full design capacity without air pollution control equipment, then the permit shall contain 1 of the following:

(i) A production limit that restricts the amount of final product that may be produced over the same time period used in the emission limit and that comports with the true design and intended operation of the process or process equipment.

(ii) An operational limit that restricts the way the process or process equipment is operated and that comports with the true design and intended operation of the process or process equipment. An operational limit may include conditions specifying any of the following:

(A) The installation, operation, and maintenance of air pollution control equipment.

(B) The hours of operation of the stationary source, process, or process equipment, if the hours are less than continuous.

(C) The amount or type of raw materials used by the stationary source, process, or process equipment.

(D) The amount or type of fuel combusted by the stationary source, process, or process equipment.

(E) The installation, operation, and maintenance of a continuous gas flow meter and a continuous emission monitor for the air contaminant for which an enforceable emission limit is required.

(iii) For volatile organic compound surface coating operations where an add-on control is not employed, an emission or usage limit coupled with a requirement to calculate or demonstrate daily compliance.

(b) A draft permit has been subjected to the public participation process specified in section 5511(3) of the act. The department shall provide a copy of the draft permit to the United States environmental protection agency for review and comment at or before the start of the public comment period. The department shall also provide a copy of each final permit to install issued pursuant to this rule to the United States environmental protection agency.

The above two requirements (a and b) apply not only to general permits, but also to a "permit to install that includes limitations which restrict the potential to emit from a stationary source,

process, or process equipment to a quantity below that which would constitute a major source or major modification . . .." (a synthetic minor permit). Rule 236.1205(1). If there is a known public controversy about an application for a permit, the NREPA requires the EGLE to provide for public notice and comment on the permit application, and to provide for public hearings. *Wolverine Power Coop*, 285 Mich App at 555.

Mich Admin Code R 336.2802 further provides, in relevant part:

(2) The requirements of R 336.2810 to R 336.2818 apply to the construction of any new major stationary source or the major modification of any existing major stationary source, except as this rule otherwise provides.

(3) No new major stationary source or major modification to which R 336.2810 to R 336.2818(2) apply shall begin actual construction without a permit to install issued under R 336.1201(1)(a) that states that the major stationary source or major modification will meet those requirements.

(4) This part applies to the construction of new major sources and major modifications to existing major sources in the following manner:

(a) Except as otherwise provided in subrule (5) of this rule, and consistent with the definition of major modification, a project is a major modification for a regulated new source review pollutant if it causes both of the following types of emissions increases:

(i) A significant emissions increase.

(ii) A significant net emissions increase.

The project is not a major modification if it does not cause a significant emissions increase. If the project causes a significant emissions increase, then the project is a major modification only if it also results in a significant net emissions increase.

(b) The procedure for calculating whether a significant emissions increase will occur depends upon the type of emissions units being modified. The procedure for calculating whether a significant net emissions increase will occur at the major stationary source is contained in the definition of net emissions increase. Regardless of preconstruction projections, a major modification results if the project causes a significant emissions increase and a significant net emissions increase.

All parties appear to agree at this juncture that the challenged permit was issued for a major modification of an existing major stationary source and, since Sierra Club submitted concerns regarding the Plant, that DTE provided for a public comment period. There also appears to be no dispute that the Plant involves a significant emissions increase. A significant emissions increase, as it applies to sulfur dioxide, is the potential of the source to emit more than 40 tons per year. Mich Admin Code R 336.2901(hh)(i)(C).

Mich Admin Code R 336.2810 then directs:

(1) A major stationary source or major modification shall meet each applicable emissions limitation under the state implementation plan and each applicable emission standards and standard of performance under 40 CFR parts 60 and 61, adopted by reference in R 336.1902.

\*\*\*

(3) A major modification shall apply best available control technology for each regulated new source review pollutant for which it would be a significant net emissions increase at the source. This subrule applies to each proposed emissions unit at which a net emissions increase in the pollutant would occur as a result of a physical change or change in the method of operation in the unit.

Thus, as a major modification of an existing major stationary source with the potential to emit more than 40 tons of sulfur dioxide per year, the project must apply the best available control technology for the sulfur dioxide.

Sierra Club asserts that the permit did not require sufficient monitoring, recordkeeping, and reporting requirements with respect to sulfur dioxide. Sierra Club points out that DTE provided for a synthetic minor permit, limiting itself to 0.34 grains/100 dscf , which is under the 40 tons per year limit on sulfur dioxide, but barely, and that DTE would only have to increase to 0.02 grains/100 dscf in order to go above the 40 tons per year. Thus, Sierra Club concludes that DTE should have to continuously monitor the sulfur dioxide levels. Sierra Club, however, simply asserts that the amount of sulfur dioxide actually emitted must be consistently precise as shown through continuous monitoring without support for such assertion.

Sierra Club has not identified any rule or regulation that requires such continuous monitoring. Instead, as previously stated, Rule 1205(1)(a) states that the permit must contain emission limits restricting the amount of the air contaminant (here, sulfur dioxide) that may be emitted over "some time period." That rule further states the "time period shall be set in accordance with the applicable requirements and, unless a different time period is provided by the applicable requirement, should generally not be more than 1 month, unless a longer time period is approved by the department. A longer time period may be used if it is a rolling time period, but shall not be more than an annual time period rolled on a monthly basis."

The 49-page issued permit contains several sections, which satisfactorily comply with Rule 336.1205. With respect to the boilers the permit states:

VI. Monitoring/Recordkeeping

Records shall be maintained on file for a period of five years. (R 336.1201(3))

1. The permitee shall complete all required calculations in a format acceptable to the AQD District Supervisor by the 30th day of the calendar month, for the previous calendar month, unless otherwise specified in any monitoring/recordkeeping

-11-

special condition. (R 336.1205(1)(a) & (b), R 336.1224, R 336.1225,R 336.1702(a), R 336.2803, R 336.2804, R 336.2810, 40 CFR 52.21(j))

2. The permittee shall keep hourly and daily natural gas usage records . . .

3. The permittee shall record hours of operation of EUAUXBOILER in a format acceptable to the AQD District Supervisor, indicating the total hours of operation in an individual calendar month and a 12-month rolling time period basis. The permittee shall keep all records on file at the facility and make them available to the Department upon request. (R 336.1205(1)(a) & (b), R 336.1225, R 336.1702(a), R 336.2803, R 336.2804, R 336.2810)

4. The permittee shall keep, in a satisfactory manner, records indicating the monthly sulfur content of the natural gas to meet SC 11,1 for EUAUXBOILER on file at the facility and make them available to the Department upon request. (R 336.1205(1)(a) & (b))

With respect to the entire project, the permit states:

## I. EMISSION LIMITS

[Sulfur dioxide has a limit of 39.42 tons per year, calculated on a 12-month rolling time period as determined at the end of each calendar month, using SC VI.1, VI.2, VI.3, Vl.4, VI.5, and VI.6 pursuant to R 336.1205[1] (a) and (b) and R 336.2902(2)(d)]

The above permit conditions meet the requirements under Rule 336.1205 because the 12-month rolling emission limit is not more than an annual time period rolled on a monthly basis. There is no requirement for continuous monitoring, and the permit requires DTE to comply with an accepted monitoring period in compliance with R 336.1205.

Rule 336.1205 requires that:

If the emission limit does not reflect the maximum emissions of the process or process equipment operating at full design capacity without air pollution control equipment, then the permit shall contain 1 of the following:

(i) A production limit that restricts the amount of final product that may be produced over the same time period used in the emission limit and that comports with the true design and intended operation of the process or process equipment.

(ii) An operational limit that restricts the way the process or process equipment is operated and that comports with the true design and intended operation of the process or process equipment.

The permit does, in fact, set forth such limits, which may be, as conceded by Sierra Club, adequate to restrict the project's potential to emit sulfur dioxide. With respect to the boilers, the permit states:

<u>I. Emission Limits</u>

A table shows that sulfur dioxide is limited to 0.0012 lb/MMBtu per month for DTE's boilers and that testing/monitoring will be via the SC VI. 4 pursuant to R 336.1205(1)(a) and (b).

<u>II. Material Limits</u>

The permittee shall burn only pipeline natural gas in EUAUXBOILER, with a sulfur content of 0.34 gr per 100 scf or less on a monthly basis. (R 336.1205(1)(a) & (b), R 336.2810, 40 CFR 52.219(j))

***

<u>III. Process/Operational Restrictions</u>

Within 180 days of initial startup, the permittee shall submit, implement, and maintain a malfunction abatement plan (MAP) as described in Rule 911(2) for EUAUXBOILER. The MAP shall, at a minimum, specify the following:

a. A complete preventative maintenance program including identification of the supervisory personnel responsible for overseeing the inspection, maintenance, and repair of air-cleaning devices, a description of the items or conditions that shall be inspected, the frequency of the inspections or repairs, and an identification of the major replacement parts that shall be maintained in inventory for quick replacement.

b. An identification of the source and air-cleaning device operating variables that shall be monitored to detect a malfunction or failure, the normal operating range of these variables, and a description of the method of monitoring or surveillance procedures.

c. A description of the corrective procedures or operational changes that shall be taken in the event of a malfunction or failure to achieve compliance with the applicable emission limits.

With respect to the entire project, the permit states:

<u>II. MATERIAL LIMITS</u>

1. The permittee shall only burn pipeline natural gas with a sulfur content of 0.34 grains per 100 scf or less on an annual basis in any unit which combusts natural gas in FGPROJECT. (R 336.1205(1)(a) & (b), R 336 2902(2)(d))

2. The permittee shall burn only diesel fuel in FGPROJECT with the maximum sulfur content of 15 ppm (0.0015 percent) by weight for any emission unit which combusts diesel fuel. (R 336.1205(1)(a) & (b), R 336.2902(2)(d).

-13-

The limitations are also enforceable as a practical matter, as required by Rule 336.1205, given that the permit states:

### General Conditions

4. The Department may, after notice and opportunity for a hearing, revoke this Permit to Install if evidence indicates the process or process equipment is not performing in accordance with the terms and conditions of this permit or is violating the Department's rules or the Clean Air Act. (R 336.1201(8), Section 5510 of Act 451, PA 1994).

\*\*\*

13. The Department may require the permittee to conduct acceptable performance tests, at the permittee's expense, in accordance with R 336.2001 and R 336.2003, under any of the conditions listed in R 336.2001.

And, defendant provided the EGLE with sampling data showing that the sulfur content of the natural gas it will use is below threshold limits. As a result, the permit restrictions on sulfur dioxide emissions satisfy all requirements set forth in Rule 336.1205 and show that the synthetic minor permit is enforceable as a practical matter.

Sierra Club also asserts that the monitoring requirements set forth in the permit lack specificity such that any monitoring requirements are not legally and practically enforceable and that the recordkeeping and reporting requirements are inadequate However, the permit specifies, with respect to the boilers:

### IV. Design/Equipment Parameters

\*\*\*

3. The permittee shall install, calibrate, maintain and operate, in a satisfactory manner, a device to monitor and record the hourly and daily natural gas usage rate for EUAUXBOILER. (R 336.1205(1)(a) & (b), R 336.1224, R 336.1225, R 336.1702(a), R 336.2803, R 336.2804, R 336.2810, 40 CFR 52.21(j)).

\*\*\*

### V. Testing/Sampling

Records shall be maintained on file for a period of five years (R 336.1201(3))

1. Within 180 days after commencement of initial startup, the permittee shall verify NOx, CC, PM, and VOCs emission rates from EUAUXBOILER by testing at the owner's expense, in accordance with Department requirements. The permittee shall complete the required testing once every five years, thereafter, unless an alternate testing schedule is approved by the District Supervisor. Testing

-14-

shall be performed using an approved EPA Method listed in[: 40 CFR Part 60, Appendix A for sulfur dioxide.]

VI. Monitoring/Recordkeeping

Records shall be maintained on file for a period of five years. (R 336.1201(3))

1. The permitee shall complete all required calculations in a format acceptable to the AQD District Supervisor by the 30th day of the calendar month, for the previous calendar month, unless otherwise specified in any monitoring/recordkeeping special condition. (R 336.1205(1)(a) & (b), R 336.1224, R 336.1225, R 336.1702(a), R 336.2803, R 336.2804, R 336.2810, 40 CFR 52.21(j))

2. The permittee shall keep hourly and daily natural gas usage records . . .

3. The permittee shall record hours of operation of EUAUXBOILER in a format acceptable to the AQD District Supervisor, indicating the total hours of operation in an individual calendar month and a 12-month rolling time period basis. The permittee shall keep all records on file at the facility and make them available to the Department upon request. (R 336.1205(1)(a) & (b), R 336.1225, R 336.1702(a), R 336.2803, R 336.2804, R 336.2810)

4. The permittee shall keep, in a satisfactory manner, records indicating the monthly sulfur content of the natural gas to meet SC 11.1 for EUAUXBOILER on file at the facility and make them available to the Department upon request. (R 336.1205(1)(a) & (b))

*** 

9. The permittee shall maintain records of all information necessary for all notifications and reports as specified in these special conditions as well as that information necessary to demonstrate compliance with the emission limits of this permit. This information shall include, but shall not be limited to the following:

a. Compliance tests and any testing required under the special conditions of this permit.

b. Monitoring data.

c. Verification of heat input capacity required to show compliance with SC IV.1.

d. Identification, type and the amounts of fuel combusted in EUAUXBOILER on an hourly basis, calendar day basis, and calendar month basis.

e. All records required by 40 CFR 60.7 and 60.48c.

f. All calculations or documents necessary to show compliance with the limits contained in this permit.

With respect to the entire project, the permit provides:

VI. MONITORING/RECORDKEEPING

Records shall be maintained on file for a period of five years. (R 336.1201(3))

1. The permittee shall complete all required calculations in a format acceptable to the AQD District Supervisor by the 30th day of the calendar month, for the previous calendar month, unless otherwise specified in any monitoring/recordkeeping special condition, (R 336.1205(1)(a) & (b), R 336.2902(2)(d))

2. The permittee shall keep, in a satisfactory manner, records indicating the monthly sulfur content of the natural gas to meet SC 11.1 for FGPROJECT on file at the facility and make them available to the Department upon request. (R 336.1205(1)(a) & (b), R 336.2902(2)(d))

***

4. The permittee shall calculate and keep, in a satisfactory manner records of monthly and 12-month rolling total S02 mass (tons) emissions for FGPROJECT. The calculations shall be performed using the most recent natural gas sulfur content sampling results as specified in FGPROJECT SC V.1 using a calculation method as approved by the AQD District Supervisor. All records and calculations shall be kept on file and made available to the Department upon request. (R 336.1205(1)(a) & (b), R 336.2902(2)(d))

Thus, the permit requires DTE to use an "EPA approved testing method listed in 40 CFR Part 60, Appendix A for sulfur dioxide." It further requires that testing be performed using "ASTM standards or an alternative method approved by" the EGLE. The permit also requires that calculation methods used by DTE must be approved by the EGLE. As to recordkeeping and reporting, DTE is required to: keep hourly and daily natural gas usage records; records indicating the monthly sulfur content of the natural gas on file at the facility and make them available to the EGLE upon request; keep and record information necessary to demonstrate compliance with the emission limits of the permit including monitoring data, verification of heat input capacity, identification, type and the amounts of fuel combusted in EUAUXBOILER on an hourly basis, calendar day basis, and calendar month basis, all records required by 40 CFR 60.7 and 60.48c., and all calculations or documents necessary to show compliance with the limits contained in the permit. While DTE is not required to submit the data to the EGLE on any particular date, all records must be kept by DTE for a period of 5 years, and the EGLE can request to see the records at any time. The EGLE having unfettered access to the daily, hourly, and monthly data is arguably more stringent than a requirement that DTE submit data to the EGLE on a regular, set basis.

Finally, the recordkeeping and reporting provisions are specific and required recordkeeping and reporting provisions that are legally and practically enforceable. Again, the general conditions of the permit state:

4. The Department may, after notice and opportunity for a hearing, revoke this Permit to Install if evidence indicates the process or process equipment is not

-16-

performing in accordance with the terms and conditions of this permit or is violating the Department's rules or the Clean Air Act. (R 336.1201(8), Section 5510 of Act 451, PA 1994).

***

13. The Department may require the permittee to conduct acceptable performance tests, at the permittee's expense, in accordance with R 336.2001 and R 336.2003, under any of the conditions listed in R 336.2001. (R 336.2001)

Revocation of the permit for any failure to comply with any of the provisions in the permit is specifically provided for and Sierra Club has indicated no reason why the EGLE could not exercise its revocation authority in a legal and practical manner.

In sum, Rule 336.1205 provides that the EGLE shall not approve a permit containing a synthetic minor limit unless two conditions are met: (1) the permit contains emission limits that are enforceable as a practical matter, with emission limits being defined as ones that restrict the amount of an air contaminant that may be emitted over a time period not longer than one month or an annual time period rolled on a monthly basis; if the permit does not reflect the potential maximum emissions the permit shall also contain production or operational limits to restrict the amount of emissions: and, (2) a draft permit has been subjected to the specified public participation process. Sierra Club has not disputed that (2) has been met and defendant has demonstrated that the permit complies with the requirements of (1). The permit, in fact, contains restrictions above what Rule 336.1205 requires and provides the EGLE with considerable and consistent oversight. The EGLE used its professional judgment and expertise in this area to require conditions in the permit that comply with administrative rules and exercised its same judgment and expertise in issuing the permit. The circuit court properly affirmed the EGLE's issuance of the permit.

## III. PRECONSTRUCTION AIR QUALITY MONITORING DATA

Sierra Club next contends that EGLE's decision to grant the permit without requiring DTE to submit preconstruction air quality monitoring data in order to determine the background levels of ozone in the Plant area was in excess of the EGLE's statutory authority, contrary to law, arbitrary and capricious, and an exercise of unlawful procedure. However, contrary to Sierra Club's assertion, DTE did, in fact, provide air quality monitoring data, albeit from an already existing monitoring source near the project site. Moreover, with respect to ozone, EGLE did not *exempt* DTE from collecting background air quality monitoring data. Instead, it found that:

Based upon the modeling results, nitrogen dioxide and particulate matter had significant impacts and required background concentrations to complete your National Ambient Air Quality Standard impact analysis. All other criteria pollutants yielded insignificant impacts and did not required any additional refined modeling.

Both parties agree that the two primary ozone precursors are sulfur oxides and volatile organic compounds. The only two things that the EGLE found had significant impacts were nitrogen dioxide and particulate matter. It thus issued a waiver of background monitoring for those two things, neither of which are seen to be primary precursors to ozone.

-17-

As to pre-construction monitoring, the Clean Air Act requires, before a permit for modification may be issued, that the applicant conducts an analysis "of the ambient air quality at the proposed site and in areas which may be affected by emissions from such facility for each pollutant subject to regulation under this chapter which will be emitted from such facility." 42 USC § 7475(e)(1). The analysis is specified as follows:

> **(2)** Effective one year after August 7, 1977, the analysis required by this subsection shall include continuous air quality monitoring data gathered for purposes of determining whether emissions from such facility will exceed the maximum allowable increases or the maximum allowable concentration permitted under this part. Such data shall be gathered over a period of one calendar year preceding the date of application for a permit under this part unless the State, in accordance with regulations promulgated by the Administrator, determines that a complete and adequate analysis for such purposes may be accomplished in a shorter period. The results of such analysis shall be available at the time of the public hearing on the application for such permit. [42 USC § 7475(e)]

The Michigan Administrative Code similarly provides:

> (1) Pre-application analysis includes all of the following:
>
> (a) Any application for a permit under this rule shall contain an analysis of ambient air quality in the area that the major stationary source or major modification would affect for each of the following pollutants:
>
> (i) For the major source, each pollutant that it would have the potential to emit in a significant amount.
>
> (ii) For the modification, each pollutant for which it would result in a significant net emissions increase.
>
> (b) For a pollutant for which a national ambient air quality standard does not exist, the analysis shall contain air quality monitoring data required by the department to assess ambient air quality for that pollutant in any area that the emissions of that pollutant would affect.
>
> (c) For a pollutant, other than nonmethane hydrocarbons, for which such a standard does exist, the analysis shall contain continuous air quality monitoring data gathered for determining whether emissions of that pollutant would cause or contribute to a violation of the standard or any maximum allowable increase.
>
> (d) The continuous air monitoring data that is required shall have been gathered over a period of 1 year and shall represent the year preceding receipt of the application, except that, if the department determines that a complete and adequate analysis may be accomplished with monitoring data gathered over a period less than 1 year, but not less than 4 months, the data that is required shall have been gathered over at least that shorter period. [Mich Admin Code R 336.2813]

Notably, Rule 336.2813 does not require that *the applicant* conduct an ambient air quality analysis. Rather, it simply states that a permit application "shall contain an analysis of ambient air quality in the area that the major stationary source or major modification would affect . . .." In its February 19, 2018 response to the EGLE's request for additional information, DTE stated that "Representative ambient air quality monitoring data exist in the vicinity of the [P]lant. The data were summarized and used in the air quality analysis presented in the *Permit to Install: Prevention of Significant Deterioration Application* submitted to the [EGLE] in January 2018." In its June 11, 2018 letter to DTE, the EGLE stated:

> Based upon the modeling results, nitrogen dioxide and particulate matter had significant impacts and required background concentrations to complete your National Ambient Air Quality Standard impact analysis. All other criteria pollutants yielded insignificant impacts and did not required any additional refined modeling.

> A review of available regional data from similar geographical and demographic monitor sites has identified representative monitors and associated background concentrations suitable for use in your application analysis.

> As such, the DEQ grants DTE Belle River's request for a preconstruction monitoring waiver and will not require any additional ambient monitoring to complete the required air quality analysis. Should DTE Belle River choose to conduct independent monitoring, that data may be substituted upon the completion of validation by AQD staff.

As much as Sierra Club objects to it, there is nothing to preclude DTE from submitting, or the EGLE from relying on, monitoring data from already existing sources rather than requiring DTE to install monitoring data itself in order to gather the relevant data. Because DTE submitted preconstruction air quality monitoring data for 2014-2016 (prior to its proposed modification) and the EGLE analyzed and accepted the data, DTE complied with the preconstruction air quality monitoring required by R 336.2813.

Sierra Club also points out, however, that there are monitoring exemptions or second steps required for certain substances. Specifically, Mich Admin Code R 336.2809(5) states that:

> (5) The department may exempt a proposed major stationary source or major modification from R 336.2813, with respect to monitoring for a particular pollutant, if any of the following occur:

> (a) The emissions increase of the pollutant from a new stationary source or the net emissions increase of the pollutant from a modification would cause, in any area, air quality impacts less than the following amounts:

> (i) Carbon monoxide -- 575 micrograms per cubic meter, 8-hour average.

> (ii) Nitrogen dioxide -- 14 micrograms per cubic meter, annual average.

(iii) Particulate matter -- 10 micrograms per cubic meter of PM-10, 24-hour average. 0 micrograms per cubic meter of PM 2.5, 24-hour average.

(iv) Sulfur dioxide -- 13 micrograms per cubic meter, 24-hour average.

(v) Ozone -- There is no de minimis air quality level for ozone. However, any net increase of 100 tons per year or more of volatile organic compounds or oxides of nitrogen subject to PSD would be required to perform an ambient impact analysis, including the gathering of ambient air quality data.

The rules of statutory construction apply to both statutes and administrative rules. *United Parcel Serv, Inc v Bureau of Safety & Regulation*, 277 Mich App 192, 202; 745 NW2d 125 (2007). We thus first look at the specific language of the rule itself and if the meaning of the rule is clear and unambiguous, judicial construction is not permitted and we are to apply the rule as written. *Id*.

Rule 336.2809(5)(a)(v) unambiguously provides, with respect to ozone, that "any net increase of 100 tons per year or more of volatile organic compounds or oxides of nitrogen subject to PSD would be required to perform an ambient impact analysis, including the gathering of ambient air quality data." Sierra Club is correct, and defendant concedes, that the data provided by DTE in its application indicates that the project would have the potential to emit 268.22 tons of oxides of nitrogen per year The trial court, however, erroneously stated "the record fails to provide evidence of any net increase in volatile organic compounds or oxides of nitrogen. Thus, Mich Admin Code R 336.2809(5)(a)(v) does not require the [EGLE] to conduct ozone monitoring." By virtue of the rule that EGLE itself implemented with respect to ozone, the EGLE could not exempt DTE from performing an ambient impact analysis—which is different from the general preconstruction air quality monitoring. The general preconstruction air quality monitoring does not require an ambient *impact* analysis and, in fact, the impact analysis is to "includ[e] the gathering of ambient air quality data."

The EGLE disagrees, asserting that because DTE's preliminary analysis showed that the ozone is below the EPA stated significant impact level (SIL), a full impact analysis with background monitoring data for ozone was not required. Defendant is incorrect, for two reasons.

First, while this Court will generally defer to the construction of an *ambiguous* statute or administrative rule given by the agency charged with administering it, deference to an agency's construction of a statute or rule is not binding on the judiciary, and the agency's construction cannot overcome a statute or rule's plain meaning. *United Parcel Serv, Inc*, 277 Mich App at 202. Moreover, this Court will not defer to the administrative agency's interpretation of an unambiguous rule or where the Court is convinced that the agency's interpretation is clearly wrong. *Id*. at 202-203 (quotation marks and citation omitted). Again, there is no ambiguity in Rule 336.2809(5)(a)(v).

Second, while the EPA does determine the standards for air quality, the Clean Air Act requires individual states to ensure that the ambient air meets the NAAQS for the identified pollutants. 42 USC § 7407(a). The Clean Air Act requires each state to submit an

implementation plan that includes, among other things, "enforceable emission limitations and other control measures, means, or techniques. . . as may be necessary or appropriate;" "appropriate devices, methods, systems, and procedures" to "monitor, compile, and analyze data on ambient air quality;" and "adequate provisions" to prohibit emissions activity that will significantly deteriorate air quality. 42 USC § 7410(a)(2). "Thus, the [Clean Air Act] supplies the goals and basic requirements of state implementation plans, but the states have broad authority to determine the methods and particular control strategies they will use to achieve the statutory requirements." *BCCA Appeal Group v US EPA*, 355 F3d 817, 822 (CA 5, 2003), as amended on denial of reh and reh en banc (2004).

More importantly, the EPA's role in approving air pollution control plans is limited. The EPA must approve a plan if it meets minimum statutory requirements, and states are free to impose stricter measures. *Id.* at 826. 42 USC 7416 specifically states:

> Except as otherwise provided in sections 1857c-10(c), (e), and (f) (as in effect before August 7, 1977), 7543, 7545(c)(4), and 7573 of this title (preempting certain State regulation of moving sources) nothing in this chapter shall preclude or deny the right of any State or political subdivision thereof to adopt or enforce (1) any standard or limitation respecting emissions of air pollutants or (2) any requirement respecting control or abatement of air pollution; except that if an emission standard or limitation is in effect under an applicable implementation plan or under section 7411 or section 7412 of this title, such State or political subdivision may not adopt or enforce any emission standard or limitation which is less stringent than the standard or limitation under such plan or section.

The Clean Air Act does "not preclude a State from submitting a plan more stringent than federal law demands, but such demands only that the proposed plan meet the minimum requirements. . . ." *Union Elec Co v EPA*, 427 US 246, 247–48; 96 S Ct 2518; 49 L Ed 2d 474 (1976). Thus, a state is free to implement pollution controls that are more stringent than EPA standards and it appears that Michigan did so in Rule 336.2809(5)(a)(v) with respect to ozone by requiring an ambient air impact analysis if there is any "net increase of 100 tons per year or more of volatile organic compounds or oxides of nitrogen."

DTE, as intervenor, argues that the EGLE has relied upon significant impact levels in its framework for addressing air quality impacts for years and that the EGLE, in fact, concluded that DTE satisfied Rule 1813 regarding ozone monitoring because the applicable significant impact level was met. DTE relies upon a "Guidance on Significant Impact levels for ozone and fine particles in the Prevention of Significant Deterioration Permitting Program" issued by the EPA on April 17, 2018 to support its position. In the guide, the EPA states:

> When a Prevention of Significant Deterioration (PSD) permit applicant has shown through air quality modeling that the projected air quality impact from a proposed source for a particular pollutant is not significant or meaningful, the EPA believes there is a valid analytical and legal basis in most cases for the permitting authority to conclude that the proposed source will not cause or contribute to a

violation of a National Ambient Air Quality Standard (NAAQS) or PSD increment for that pollutant. To show that the proposed source will not have a significant or meaningful impact on air quality, permit applicants and permitting authorities may elect to use these Significant Impact Level (SIL) values (air quality concentration values) as a compliance demonstration tool. . . . The use of SILs can help satisfy PSD requirements while expediting the permitting process and conserving resources for permit applicants and permitting authorities. The EPA has previously issued guidance describing particular uses of SILs.[1,2,3,4] The EPA has also recognized that permitting authorities have the discretion to apply SILs on a case-by-case basis in the review of individual permit applications, provided such use is justified in the permitting record.

In the above, the EPA indicated that the SIL for ozone is 1.0 parts per billion. DTE's analysis submitted in its permit application showed that the anticipated ozone impact from the project was 0.55 parts per billion, which is less than the 1.0 parts per billion considered to be a significant impact by the EPA.

The EPA further stated in the Guidance document:

The EPA recommends that permitting authorities consider using these SIL values for ozone and PM2.5 on a case-by-case basis at the same points in the PSD air quality analysis as SIL values historically have been used in the PSD program, as described below, with one exception regarding defining the spatial extent for modeling. First, permitting authorities may elect to use the SIL values reflected in this guidance in a preliminary (single-source) analysis that considers only the impact of the proposed source in the permit application on air quality to determine whether a full (or cumulative) impact analysis is necessary before reaching a conclusion as to whether the proposed source would (or would not) cause or contribute to a violation. A modeled result predicting that a proposed source's maximum impact will be below the corresponding SIL value recommended above generally may be considered to be a sufficient demonstration that the proposed source will not cause or contribute to a violation of the applicable NAAQS or PSD increment. If the single-source analysis shows that a proposed source will not have a significant impact on air quality, permitting authorities may generally conclude there is no need to conduct a cumulative impact analysis to assess whether there will be any violations of the NAAQS or PSD increment.

However, as stated in the Guidance document itself, "the EPA is providing non-binding guidance so that we may gain valuable experience and information as permitting authorities use their discretion to apply and justify the application of the SIL values identified below on a case-by-case basis in the context of individual permitting decisions." The document also contains the following statements, among others: "this guidance is not a final agency action and does not reflect a final determination by the EPA that any particular proposed source with a projected impact below the recommended SIL value does not cause or contribute to a violation;" "[t]his guidance is not legally binding and does not affect the rights or obligations of permit applicants, permitting authorities, or others," and, "[p]ermitting authorities retain the discretion to apply and justify different approaches and to require additional information from the permit applicant to make the required

air quality impact demonstration." Thus, the EPA makes it patently clear that the document is for guidance only and has no legally binding value. DTE's reliance on the document has no impact on this Court's analysis of the unambiguous requirements set forth in Rule 336.1813.

In sum, the trial court properly found that the EGLE's determination that preconstruction air quality monitoring requirements set forth in Rule 336.1813 were met. The trial court erred, however, in stating that there was no record evidence "of any net increase in volatile organic compounds or oxides of nitrogen" and that Rule 336.2809 requiring an ambient impact analysis was thus inapplicable. We therefore affirm in part and reverse in part. We direct the trial court to review the acknowledged record evidence that the Plant has the potential of a net increase of 100 tons per year or more of oxides of nitrogen and determine whether, as a result, DTE was required to perform an ambient impact analysis, including the gathering of ambient air quality data, with respect to ozone as set forth in Rule 336.2809(5)(a)(v). Based upon its review of the record evidence, the trial court may also need to reconsider its determination concerning whether the EGLE should have granted the permit.

Affirmed in part, reversed in part, and remanded to the trial court for proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Cynthia Diane Stephens
/s/ Deborah A. Servitto
/s/ Anica Letica