*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

ER DRUGS,

Appellant,

v

DEPARTMENT OF HEALTH AND HUMAN
SERVICES,

Appellee.

FOR PUBLICATION
March 17, 2022
9:00 a.m.

No. 355108
Ingham Circuit Court
LC No. 19-000770-AA

Before: CAVANAGH, P.J., and MARKEY and SERVITTO, JJ.

PER CURIAM.

Appellant, ER Drugs, which is a pharmacy, appeals by leave granted[1] a circuit court order upholding a decision by the Department of Health and Human Services (DHHS) to require repayment by the pharmacy of $1,205,426.23 in Medicaid overpayments. We affirm.

## I. BASIC FACTS

This case involves a fiscal audit of ER Drugs by DHHS's Office of Inspector General (OIG). The audit, encompassing transactions from January 2010 to July 2016, resulted in a finding by DHHS that ER Drugs owed $1,205,426.23 for Medicaid fee-for-service overpayments.[2] The audit method DHHS employed is referred to as an invoice/inventory reconciliation audit (IR audit). It involves comparing wholesale quantities of drugs ordered to amounts billed; if fewer drugs were ordered than were billed, the apparent excess in Medicaid billing is to be recovered by DHHS. To arrive at a reimbursement amount, DHHS looked at discrepancies between wholesale drugs supplied and total billings, and then applied to those discrepancies a factor to account for how

---

[1] See *ER Drugs v Dep't of Health & Human Servs*, unpublished order of the Court of Appeals, entered December 18, 2020 (Docket No. 355108).

[2] DHHS has presented evidence that Raad Kouza, the owner of ER Drugs, is facing a criminal indictment for Medicaid fraud.

-1-

much of each type of drug is generally paid for by Medicaid fee-for-service (as opposed to private insurers or other payment sources).[3] The average price paid by Medicaid fee-for-service during the audit period for each particular drug was then applied.

ER Drugs contested the amount alleged to be owed, but after an evidentiary hearing, an administrative law judge (ALJ) upheld the assessment in a lengthy and detailed proposal for decision (PFD). The director of DHHS adopted the PFD without elaboration. The circuit court concluded that the appeal of the final administrative decision by ER Drugs in that court was subject to dismissal because ER Drugs had not filed any exceptions to the PFD before the director's final decision. In any event, the court concluded, no errors requiring reversal were apparent.

## II. EXCEPTIONS REQUIREMENT

ER Drugs contends that the circuit court erred by concluding that the failure by ER Drugs to file any exceptions to the PFD resulted in a waiver of ER Drugs' objections. ER Drugs contends that a proper interpretation of MCL 24.281 indicates that no exceptions needed to be filed to preserve its objections in the present case, because the director of DHHS had read, and was required to read, the record. We disagree.

In general, this Court reviews de novo issues of statutory construction. *Elba Twp v Gratiot Co Drain Comm'r*, 493 Mich 265, 278; 831 NW2d 204 (2013). Also, "[t]his Court reviews a lower court's review of an administrative decision to determine whether the lower court applied correct legal principles . . . ." *Vanzandt v State Employees Retirement Sys*, 266 Mich App 579, 585; 701 NW2d 214 (2005).

The ALJ stated, in its PFD, "Any party may, within ten (10) days from the date of mailing this decision, file exceptions . . . ." It is not disputed that ER Drugs did not file any such exceptions. Thereafter, the director of DHHS issued a final order, stating, "Having read and considered the entire record in this matter, I find that the Administrative Law Judge's Proposal for Decision is correct." The director explicitly adopted the PFD.

MCL 24.281 states:

(1) When the official or a majority of the officials of the agency who are to make a final decision have not heard a contested case or read the record, the decision, if adverse to a party to the proceeding other than the agency itself, shall not be made until a proposal for decision is served on the parties, and an opportunity is given to each party adversely affected to file exceptions and present written arguments to the officials who are to make the decision. Oral argument may be permitted with consent of the agency.

---

[3] In other words, if 68% of the billings for "drug X" are Medicaid fee-for-service billings, then the total of the inventory discrepancy for "drug X" would be multiplied by .68 to arrive at a repayment quantity.

(2) The proposal for decision shall contain a statement of the reasons therefor and of each issue of fact and law necessary to the proposed decision, prepared by a person who conducted the hearing or who has read the record.

(3) The decision, without further proceedings, shall become the final decision of the agency in the absence of the filing of exceptions or review by action of the agency within the time provided by rule. On appeal from or review of a proposal of decision the agency, except as it may limit the issue upon notice or by rule, shall have all the powers which it would have if it had presided at the hearing.

(4) The parties, by written stipulation or at the hearing, may waive compliance with this section.

"The primary goal of statutory interpretation is to give effect to the Legislature's intent, focusing first on the statute's plain language." *Klooster v Charlevoix*, 488 Mich 289, 296; 795 NW2d 578 (2011). The words of a statute are the most reliable evidence of its intent, and statutes should be read as a whole. *Id*.

At the time the ALJ issued its PFD, the "official" who was to "make a final decision"— i.e., the director of DHHS—had not heard the contested case and had not yet read the record. While the director was going to read the record and eventually did read the record, he had not done so at the time of the ALJ's ruling. MCL 24.281(1) refers to an action to be undertaken in the future ("officials of the agency who are to make a final decision"). And one must keep in mind the maxim that statutes are to be read as a whole. "[S]tatutes must be construed as a whole with the provisions read in the context of the entire statute so as to produce a harmonious whole." *Estate of Romig by Kooman v Boulder Bluff Condos Units 73-123, 125-146, Inc*, 334 Mich App 188, 196; 964 NW2d 133 (2020). MCL 24.281(2) refers to the preparation *by the person who has conducted the hearing or read the record* of a detailed proposal. Viewing MCL 24.281(1) and (2) together indicates that the statutory scheme is referring to exactly the type of situation that took place in the present case, wherein an ALJ undertook the initial review (conducting a hearing or reading the record) and a final decisionmaker, who had *not yet* read the record, was to make a final decision. This conclusion is reinforced by the fact that MCL 24.281(3) states that an agency, on review of a PFD, "shall have all the powers which it would have if it had presided at the hearing."

In *Attorney General v Pub Serv Comm*, 136 Mich App 52, 56; 355 NW2d 640 (1984), the Court, citing MCL 24.281, indicated that the failure to file exceptions to a PFD constitutes a waiver of objections not raised. See also *Robertson v Local Division 26, Amalgamated Transit Union*, 91 Mich App 429, 432-433; 283 NW2d 766 (1979). ER Drugs states that these decisions are not binding because they predate November 1, 1990. See MCR 7.215(J)(1) ("A panel of the Court of Appeals must follow the rule of law established by a prior published decision of the Court of Appeals issued on or after November 1, 1990, that has not been reversed or modified by the Supreme Court, or by a special panel of the Court of Appeals as provided in this rule."). We note, however, that published cases predating November 1, 1990, still hold value. *Woodring v Phoenix Ins Co*, 325 Mich App 108, 114; 923 NW2d 607 (2018) ("[T]his Court may not be strictly bound to follow older published cases, but traditionally regards them as retaining some authority, at least if they were not disputed by some other contemporaneous case.").

In addition, in *In re MCI Telecom Corp Complaint*, 240 Mich App 292, 310; 612 NW2d 826 (2000), the Court stated:

> Next, Ameritech argues that the [Michigan Public Service Commission] should have excluded Gerdes' testimony because (1) it constituted hearsay and (2) Gerdes did not preserve his notes regarding the substance of the testimony. We conclude that Ameritech failed to preserve this issue for appeal, because it failed to raise the issue of the admissibility of Gerdes' testimony in its exceptions to the hearing officer's proposal for decision.

Given the statutory language and the existing caselaw, the circuit court did, in fact, apply correct legal principles by concluding that ER Drugs waived its arguments. See *Vanzandt*, 266 Mich App at 585.

In light of the above analyses and in light of the language from MCL 24.281(3) that "[t]he decision, without further proceedings, shall become the final decision of the agency in the absence of the filing of exceptions"—language that emphasizes the importance of filing exceptions—we reaffirm the pertinent principle from the *Attorney General v Pub Serv Comm* case decided in 1984.[4] Although our affirmance of the circuit court's dismissal of the case on the basis of the "exceptions" issue technically renders unnecessary a resolution of the remainder of the issues on appeal, we nevertheless, for the sake of completeness, choose to address them.

## III. RES JUDICATA

ER Drugs contends that an earlier audit of ER Drugs by DHHS—referred to by the parties as "the Xerox audit"—that occurred for the period from March 2, 2011 to April 9, 2012, should have barred certain of the present overpayment assessments on the basis of res judicata. We disagree.

In general, whether res judicata applies is a question of law reviewed de novo. *Ditmore v Michalik*, 244 Mich App 569, 574; 625 NW2d 462 (2001). Also, as previously noted, "[t]his Court reviews a lower court's review of an administrative decision to determine whether the lower court applied correct legal principles . . . ." *Vanzandt*, 266 Mich App at 585.

In *Adair v State*, 470 Mich 105, 121; 680 NW2d 386 (2004), the Court stated:

> The doctrine of res judicata is employed to prevent multiple suits litigating the same cause of action. The doctrine bars a second, subsequent action when (1) the prior action was decided on the merits, (2) both actions involve the same parties or their privies, and (3) the matter in the second case was, or could have been, resolved in the first. This Court has taken a broad approach to the doctrine of res judicata, holding that it bars not only claims already litigated, but also every claim

---

[4] The argument ER Drugs raises on appeal about the use of the word "may" in the PFD does not require an extended discussion. Clearly, no party was obligated by law to file any exceptions, and the use of the word "may" merely indicates as much. But the fact that no party was required to file exceptions does not obviate the consequences of choosing not to file exceptions.

arising from the same transaction that the parties, exercising reasonable diligence, could have raised but did not.  [Citations omitted.]

In *William Beaumont Hosp v Wass*, 315 Mich App 392, 399; 889 NW2d 745 (2016), the Court stated that the preclusion doctrines (such as res judicata) "are applicable to administrative decisions (1) that are adjudicatory in nature, (2) when a method of appeal is provided, and (3) when it is clear that the Legislature intended to make the decision final absent an appeal."  (Quotation marks and citations omitted).

It is not necessary to get into detail regarding whether res judicata applies, in a general sense, to the present case under the rubric of *William Beaumont Hosp*, because even assuming that it does, no error would be apparent.  Indeed, in *PT Today, Inc v Comm'r of Office of Fin and Ins Servs*, 270 Mich App 110, 146-147; 715 NW2d 398 (2006), this Court stated:

> In this case, plaintiffs correctly argue that, while their causes of action have the same name in *PT Today I* and the instant case, they have distinct factual bases. Plaintiffs' tortious interference claims in *PT Today I* were based on BCBSM's differential reimbursement of hospital physical therapists and independent physical therapists.  In the instant case, however, plaintiffs argue that BCBSM is violating its own reimbursement scheme . . . .   These transactions and occurrences are removed from each other in time, subject matter, and legal basis.  Moreover, they require different factual proofs.  In *PT Today I*, plaintiffs would have to have proved that the [provider class plan] was discriminatory, that the Act proscribed discriminatory reimbursements, and that this discrimination reduced plaintiffs' market share; in the instant case, plaintiffs must prove that BCBSM knowingly promoted the mischaracterization of claims, that this mischaracterization was unlawful, and that this mischaracterization reduced plaintiffs' market share.  If different facts or proofs would be required, res judicata does not apply; consequently, res judicata does not apply to the instant case.

DHHS's auditing witness, Michael Melvin, testified that the Xerox audit was concerned with whether prescriptions contained required information.  He stated that prescription reviews were of a different character than fiscal reviews.  He noted that whether drugs were paid for by Medicaid but not actually dispensed (i.e., a pertinent question for an IR audit) was an irrelevant question for a prescription review.  Melvin indicated that a prescription could be in a proper form even if the associated drug was never dispensed.  And, apparently, overpayment charges associated with the Xerox audit were credited to ER Drugs in connection with the present IR audit.

The testimony established that the Xerox audit was concerned with an entirely different issue than the fiscal IR audit.  Whether prescriptions contained required information is a different question from whether wholesale purchases did not match with billings.  Different facts and proofs were at issue, and therefore no error is apparent with regard to the doctrine of res judicata.  See *id*.

## IV.  UNDERPINNINGS OF THE IR AUDIT

ER Drugs contends that the results of the IR audit were not supported by competent, material, and substantial evidence because of various errors made by DHHS in conducting the audit.  We disagree.

"A final agency decision is subject to court review but it must generally be upheld if it is not contrary to law, is not arbitrary, capricious, or a clear abuse of discretion, and is supported by competent, material and substantial evidence on the whole record."  *Vanzandt*, 266 Mich App at 583.  "Substantial evidence is that which a reasonable mind would accept as adequate to support a decision, being more than a mere scintilla, but less than a preponderance of the evidence."  *Id*. at 584 (quotation marks and citation omitted).  "If there is sufficient evidence, the circuit court may not substitute its judgment for that of the agency, even if the court might have reached a different result."  *Id*.

"This Court reviews a lower court's review of an administrative decision to determine whether the lower court applied correct legal principles and whether it misapprehended or misapplied the substantial evidence test to the agency's factual findings, which is essentially a clearly erroneous standard of review."  *Id*. at 585.  "A finding is clearly erroneous where, after reviewing the record, this Court is left with the definite and firm conviction that a mistake has been made."  *Id*.  "Thus, the circuit court's decision will only be overturned if this Court is left with a definite and firm conviction that a mistake was made."  *Id*.[5]

## A.  MISCELLANEOUS ARGUMENTS

ER Drugs alleges an error regarding DHHS's use of average prices to reach a final overpayment amount for each drug.  Melvin testified, "[O]ur pricing methodology just takes the Medicaid fee for service portion of that discrepancy during the time frame."  He said, "It's an average price per unit for the audit period in question.  And this is arrived at taking the total amount paid by fee for service Medicaid for that time period, dividing it by the total number of units, and you get the average price per unit as paid out."

The argument being made by ER Drugs on appeal in connection with average pricing is not entirely clear.  If it is taking issue with fluctuations in the prices paid by ER Drugs to wholesalers, such fluctuations were irrelevant to the IR audit because DHHS was looking to the average price *paid by Medicaid*.  Melvin explicitly stated that the price *paid by ER Drugs* was not pertinent to the audit.  If ER Drugs is taking issue with fluctuations in Medicaid pricing, it cannot be said that the circuit court misapplied the substantial evidence test to the agency's findings.  See *Vanzandt*, 266 Mich App at 585.  The average-price model spread the reimbursement amount throughout the entire audit period, therefore "evening out" fluctuations in Medicaid pricing.

ER Drugs also takes issue with the fact that DHHS did not interview Medicaid beneficiaries who filled prescriptions at ER Drugs, but such interviews would not be pertinent for an IR audit.

---

[5] These standards of review are also applicable to Part V of this opinion.

Beneficiary interviews, for example, would provide no insight regarding whether there may be trafficking in black-market drugs.

ER Drugs also states that DHHS's "starting premise that the inventory levels remained constant throughout the audit period was a faulty assumption. ER Drugs' owner testified that ER Drugs generally did not stock name brand medications after a generic equivalent became available." But ER Drugs utterly fails to indicate how this assumption regarding inventory levels affected the outcome of the IR audit and the assessed repayment amount.[6] "It is not sufficient for a party simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position." *Wilson v Taylor*, 457 Mich 232, 243; 577 NW2d 100 (1998) (quotation marks and citation omitted). ER Drugs is, in some respects, tying its "inventory" argument to its argument about average pricing. It states, "The Department's use of an average price ignored seasonal variations in inventory levels that were the result of ER Drugs' legitimate efforts to reduce its tax liability at the end of each year and its desire to stock up on medications before prices increased, which tended to occur in January of each year." As noted, however, the price *paid by ER Drugs* for a medication was not relevant for the IR audit.[7]

ER Drugs also makes an argument about a wholesaler referred to as "Cumberland." Melvin stated that DHHS tried to reach Cumberland, but it had gone out of business. He said that Cumberland's wholesaler license had expired in June 2010, so DHHS had no way to reach the company. He testified:

> And again, this information was conveyed to the pharmacy. So if there were specific purchases that they had, they could've sent in paper documentation to substantiate this. And this goes for any wholesaler with which there could've been issues with contact. It is the pharmacy's responsibility to furnish those invoices if they have them.

Melvin said that ER Drugs did not provide any invoices regarding Cumberland. The owner of ER Drugs, for his part, stated that he had had no luck reaching Cumberland.

Melvin explained that it was unlikely that Cumberland had been supplying "substantial amounts of psychotic medications to ER Drugs" in 2010. He said:

> So an expired license would generally mean that the entity has been out of business for quite some time. The renewal process associated with that you would want to keep that up to date and renew it far ahead of when it actually expired. And given that it lapsed in—on June 30th of 2010, Cumberland was likely out of business before 2010 and therefore, was out of business outside of the audit period in question.

---

[6] Indeed, it seems that the wholesale orders would have reflected the different "stock" levels referred to by Raad Kouza. He referred to "not stock[ing] the brand once it goes generic."

[7] The "steady inventory" issue is discussed further in Part VI of this opinion.

In addition, MCL 400.111b(6) states:

> A provider shall maintain records necessary to document fully the extent and cost of services, supplies, or equipment provided to a medically indigent individual and to substantiate each claim and, in accordance with professionally accepted standards, the medical necessity, appropriateness, and quality of service rendered for which a claim is made.

Also, Medicaid providers are advised that "fiscal records must be maintained," including, among other records, "[c]opies of purchase invoices for items offered or supplied to the beneficiary." Medicaid Provider Manual, General Information for Providers, Subsection 14.6.

Given Melvin's testimony and given the recordkeeping requirement that ER Drugs did not follow,[8] we cannot conclude that the circuit court misapplied the substantial evidence test to the agency's findings with regard to the Cumberland issue. See *Vanzandt*, 266 Mich App at 585.[9]

## B. DRUG-UTILIZATION REPORT

ER Drugs takes issue with DHHS's reliance on a drug-utilization report (DUR) for billing information. Wayne Seiler, a pharmacy-software developer who testified for ER Drugs, stated that a DUR "is certainly not a billing report or a dispensing report." He stated that the DUR contains prescription requests that might not be billed, such as requests for prior authorizations or requests for drugs that might interact with other drugs a patient is taking. Seiler stated that he had become aware that OIG was using DURs improperly and had tried multiple times to get the office to understand that the methodology was improper, but he kept getting put off. Also, DHHS's own witness, Melvin, admitted that he did not know the difference between a DUR and a billing report. He also said that the DUR might contain drugs that needed prior authorizations but that were never actually billed.

However, the case of *Prechel v Dep't of Social Servs*, 186 Mich App 547; 465 NW2d 337 (1990), is instructive in considering DHHS's use of the DUR. In that case, the petitioner, a physician, appealed a circuit court opinion upholding a "final decision and order by the Department of Social Services [DSS, the predecessor to DHHS] requiring petitioner to repay the department $120,000 in medicaid overpayments." *Id*. at 548. This Court stated:

---

[8] Interestingly, ER Drugs does not mention any alleged fire or flood in the context of this issue. See footnote 11.

[9] The argument ER Drugs makes about the Xerox audit in the context of this issue is misplaced. ER Drugs apparently believes that it should be credited for every "clean" prescription found during the Xerox audit. Evidently, Medicaid overpayment charges associated with the Xerox audit and paid by ER Drugs were credited to ER Drugs in connection with the present IR audit, but there is no basis for crediting ER Drugs for every *proper* prescription found during the Xerox audit, which was not a fiscal audit.

The overpayment was computed through the use of a statistical random-sampling extrapolation formula wherein the DSS would examine a certain percentage of cases within the two-year period, make a determination of the percentage of those cases that were overcharged, and apply that percentage to the total number of cases during the two-year period. On appeal, petitioner alleges that the hearing referee incorrectly applied the burden of proof to petitioner[.] [*Id.*]

The *Prechel* Court resolved the issue as follows:

The hearing procedures involved in assessing overpayments to a medicaid provider have been upheld by this Court and were determined not to be a violation of due process where the provider is given an opportunity to rebut the initial determination of overpayment. *Quality Clinical Laboratories, Inc v Dep't of Social Servs*, 141 Mich App 597, 601; 367 NW2d 390 (1985). The extrapolation process used by the DSS creates a rebuttable presumption placing the burden on the physician to demonstrate that the department's calculations are inaccurate. At all times the burden is on the physician to prove entitlement to welfare monies. *Illinois Physicians Union v Miller*, 675 F2d 151, 154 (CA 7, 1982). On appeal, petitioner objects to the hearing referee's imposing on him the burden of proof on the issue of his entitlement to the disputed payments by requiring that he demonstrate that the department's calculations are inaccurate. The *Miller* court specifically allowed the state to place the burden on the physician to demonstrate that the department's calculations were inaccurate. *Id.* Further, this Court in *Zenith Industrial Corp v Dep't of Treasury*, 130 Mich App 464, 468; 343 NW2d 495 (1983), held that an administrative agency may allocate the burden of proof by ad hoc decision so long as the allocation is consistent with the legislative scheme being administered. Considering the legislative scheme underlying the joint federal-state medicaid program as announced in *Miller*, we find that the hearing referee did not err in placing the burden of proof on petitioner to establish his entitlement to payment. [*Id.* at 548-549.]

While ER Drugs contended that the DUR was not a billing report, it never pointed to specific instances in which the DUR was not an accurate representation of billing. The ALJ emphasized this point. The ALJ said, "[D]espite testimony . . . regarding work-product that could lead to a prescription being identified in the DUR despite never being dispensed or billed, Petitioner did not identify any specific examples of actual errors in the DUR." The ALJ added, "The developer of the software Petitioner uses also expressly testified that it is not difficult to generate a billing report or a dispensing report, but Petitioner never provided such a report despite ample opportunity to do so." And indeed, Seiler admitted that it was not difficult to generate a billing report with the software. In light of *Prechel* and in light of the failure of ER Drugs to produce an apparently easy-to-generate billing report, we cannot conclude that the circuit court misapplied the substantial evidence test to the agency's findings with regard to the DUR issue. See *Vanzandt*, 266 Mich App at 585.

## V. SIGNATURE LOGS

ER Drugs contends that DHHS's decision was arbitrary and capricious because it refused to consider signature logs, and an associated expert report, presented by ER Drugs. We disagree.

In *Vanzandt*, 266 Mich App at 584-585, this Court quoted *Romulus v Dep't of Environmental Quality*, 260 Mich App 54, 63-64; 678 NW2d 444 (2003), which stated:

> To determine whether an agency's decision is "arbitrary," the circuit court must determine if it is " ' "without adequate determining principle[,] . . . fixed or arrived at through an exercise of will or by caprice, without consideration or adjustment with reference to principles, circumstances, or significance, . . . decisive but unreasoned." ' " *St Louis v Mich Underground Storage Tank Fin Assurance Policy Bd*, 215 Mich App 69, 75; 544 NW2d 705 (1996), quoting *Bundo v Walled Lake*, 395 Mich 679, 703 n 17; 238 NW2d 154 (1976), quoting *United States v Carmack*, 329 US 230, 243; 67 S Ct 252; 91 L Ed 209 (1946). "Capricious" has been defined as: " ' "Apt to change suddenly; freakish; whimsical; humorsome." ' " *St Louis*, *supra* at 75; 544 NW2d 705, quoting *Bundo*, *supra* at 703 n 17; 238 NW2d 154, quoting *Carmack*, *supra* at 243; 67 S Ct 252.

It was elicited at the administrative hearing that ER Drugs sent DHHS a review of signature logs undertaken by a consultant, Dale Howe. Melvin explained that this review was not taken into account by DHHS because it was irrelevant to an IR audit. He said, "[S]ignature logs are not financial records and are irrelevant to an invoice reconciliation." Melvin stated that signature logs do not contain financial information. Given this testimony by Melvin, the circuit court did not err by concluding that DHHS's final decision was not arbitrary or capricious.

An IR audit involves comparing drugs purchased at wholesale with drugs billed. As for signature logs, the portion of the Medicaid Provider Manual (MPM) specifically applicable to pharmacies states, in part:

> Pharmacy providers must document receipt or delivery of new or refilled medications to the intended Medicaid beneficiary. This documentation serves as verification of the beneficiary receiving the prescription billed. The absence of the appropriate verification indicates the beneficiary did not receive the prescription, and funds will be recouped from the pharmacy. Documentation described below must be retained for review by MDHHS or the MDHHS agent for seven years and is subject to audit. Any method of reproducing past signatures is not acceptable. [Medicaid Provider Manual, Pharmacy, Subsection 5.1.]

It continues:

> Pharmacy providers must maintain a log containing the following information:
>
> - Beneficiary's name;
>
> - The signature of the beneficiary or that of his representative; and

- The date of receipt of the prescription.

The log must effectively differentiate between prescriptions received by a beneficiary for which counseling was accepted and provided, and those for which counseling was offered and was declined. [Medicaid Provider Manual, Pharmacy, Subsection 5.1.A.]

It seems that signature logs could be one potential manner in which to audit Medicaid billings, because billings could be compared against signature logs, which serve, according to the manual, as "verification of the beneficiary receiving the prescription billed." Apparently, Howe undertook such a comparison and reached a recovery amount of $71,529.58. But this is not the type of audit that DHHS undertook. It undertook an IR audit, and the agency was presented with testimony that signature logs are not relevant to an IR audit.[10] Accordingly, ER Drugs has not established an entitlement to reversal with respect to this issue.[11]

## VI. RETROACTIVE APPLICATION OF SUBSECTION 19.2 OF THE MEDICAID PROVIDER MANUAL

ER Drugs contends that DHHS, in conducting the IR audit, improperly retroactively applied subsection 19.2 of the Pharmacy chapter of the MPM. We disagree.

This issue concerns a question of law, and questions of law are reviewed de novo. *Harbour v Correctional Med Servs, Inc*, 266 Mich App 452, 455; 702 NW2d 671 (2005). And again, "[t]his

---

[10] It seems that an IR audit would encompass a situation in which "false" signatures had been employed to obtain Medicaid funds, in addition to situations involving drugs obtained on the black market.

[11] ER Drugs states that Howe pointed out that a handful of Medicaid claims were paid at zero dollars. ER Drugs states that this "would ultimately inflate the amount that ER Drugs would have to repay if the Department's audit was accepted without adjustment." But Howe was issuing a report about his own signature-log audit and does not, in his report, explain how and to what degree DHHS's repayment figure should have been adjusted on the basis of this alleged oversight. Again, "It is not sufficient for a party simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position." *Wilson*, 457 Mich at 243 (quotation marks and citation omitted). In the context of the present issue, ER Drugs also argues about an alleged fire and flood at the pharmacy. The ALJ and DHHS acted within their rights in not relying on any information about the fire and flood, seeing as this information was not communicated to the auditors during the back-and-forth correspondence about the repayment amount but was only brought out at the administrative hearing. In addition, and more importantly, nobody testified that the billing figures derived from the DUR were somehow impacted by this alleged fire and flood, and DHHS obtained the wholesale/invoice information directly from the wholesalers.

-11-

Court reviews a lower court's review of an administrative decision to determine whether the lower court applied correct legal principles . . . ." *Vanzandt*, 266 Mich App at 585.

In *Dearborn Hts Pharmacy v Dep't of Health & Human Servs*, ___ Mich App ___, ___; ___ NW2d ___ (2021) (Docket No. 354008); slip op at 2-3, the petitioner argued that DHHS did not have the authority to conduct IR audits pertaining to the period before the implementation of subsection 19.2 of the Pharmacy chapter of the MPM. This Court set forth the following background information:

> On June 1, 2015, DHHS issued a "bulletin" informing Medicaid pharmacies of efforts to clarify the documentation requirements for pharmacy providers. Specifically, the bulletin notified the pharmacies they must maintain particular documents "to support the size and quantity of the goods paid for by Medicaid." The bulletin stated the effective date was July 1, 2015—and, it was later incorporated into the Pharmacy chapter of the Michigan Medicaid Provider Manual ("MPM") at Subsection 19.2, Invoice and Inventory Records. [*Id*. at ___; slip op at 1-2.]

The Court then stated, "Though petitioner disputes the applicability of Subsection 19.2 of the MPM to the audit at issue, there are a number of authorities that predate and authorize the conduct of this audit." *Id*. at ___; slip op at 3. The Court set forth a substantial number of laws referring to DHHS's investigative powers and to recordkeeping obligations of Medicaid providers and indicated that these laws allowed for an IR audit to be conducted. *Id*. at ___; slip op at 3-7. The Court said that "DHHS-OIG clearly has long had broad authority to investigate possible fraud by the unambiguous terms of these provisions. Thus, the trial court failed to consider the plain language of other authority granting DHHS the authority to conduct investigations by focusing its conclusion of the effective date of Subsection 19.2." *Id*. at ___; slip op at 8. The Court stated, "[W]e reverse the holding of the trial court finding that OIG's authority to conduct inventory reconciliation audits is derived from and limited to Subsection 19.2." *Id*. at ___; slip op at 8.

ER Drugs states that "[t]his Court should not [sic] remand with instructions that the Department must conduct its invoice reconciliation prospectively only," but *Dearborn Hts Pharmacy* indicates that a prospective-only IR audit is not required.

The *Dearborn Hts Pharmacy* Court undertook a separate analysis regarding an argument the petitioner in that case made about specific document-retention requirements of subsection 19.2 (as opposed to the general authority to conduct IR audits). *Id*. at ___; slip op at 9. The Court stated:

> DHHS also argues the enactment of Subsection 19.2 was within the scope of its statutory authority, and it acted within that authority when it demanded petitioner produce documentation to support its Medicaid billings. We agree in part, and disagree in part. . . .
>
> Initially, we must clarify the issue at hand. Rather than asking whether Subsection 19.2 exceeded the scope of DHHS's statutory authority, the more pertinent question is whether the trial court correctly applied its review authority over the administrative law judge's opinion. The trial court held "that conducting

an inventory audit and requiring all of the documents set forth in subsection 19.2 of the Pharmacy Chapter of the Michigan [MPM] be maintained or be subject to recoupment prior to July 1, 2015 is not authorized by law." Again, the starting place for our limited review is to determine whether the lower court applied correct legal principles and whether it misapprehended or grossly misapplied the substantial evidence test to the agency's factual findings. Indeed, this latter standard is indistinguishable from the clearly erroneous standard of review that has been widely adopted in Michigan jurisprudence.

Using the applicable standard, we find the trial court misapprehended . . . the substantial evidence test to the agency's factual findings. Absent from the administrative law judge's factual findings was any determination that OIG "require[d] all of the documents set forth in subsection 19.2." In fact, the record from the administrative review shows that OIG's only requirement of petitioner was that the records it produced must be "reliable." Because there is no evidence the administrative law judge's factual findings required the use of Subsection 19.2 documents, and because the record shows that OIG did not specifically require Subsection 19.2 documents, the trial court erred in reversing DHHS's decision. Consequently, we reverse the trial court. [*Id*. at ___; slip op at 9 (quotation marks, citations, and brackets omitted).]

In the present case, there is no indication that DHHS required *all* documents mentioned in subsection 19.2, which states:

In addition to all other documentation required under state law, federal law, and MDHHS policy, pharmacy providers must maintain invoices, manufacturer and/or wholesaler sales records, distributor delivery records to the provider, inventory transfer records, provider payment records, and all other records necessary to support the size and quantity of the goods paid for by Medicaid during the audit/review period. Failure to do so will result in the recoupment of pharmacy funds related to unsupported Medicaid claims. In the event inventory for any such product cannot be substantiated through reliable documentation for the beginning of the audit/review period, MDHHS may assume that the beginning and ending inventory quantities are the same for that product. For the purposes of this policy, the "audit/review period" shall be a period defined by MDHHS. [Medicaid Provider Manual, Pharmacy, Subsection 19.2.]

Also, while the ALJ in the present case did refer to subsection 19.2 and its recordkeeping requirements, the ALJ went on to spend considerable time setting forth how other portions of the MPM, as well as statutory law, allowed DHHS to require the documentation that was used in this case. The ALJ stated, for example:

Additionally, while not specifically cited in the notices sent to Petitioner, other statutes and policies similarly required that Petitioner maintain the applicable records in this case throughout the audit period. For example, MCL 400.111b(6) and MCL 400.111b(8) require that a pharmacy maintain the records necessary to both fully document the extent of costs of services, supplies, or equipment provided to beneficiaries and to substantiate each claim for a period of 7 years after the date

of service. Likewise, Section 15.6 [sic, 14.6] of the General Information for Providers Chapter expressly stated at all times relevant to this matter that providers must maintain "[c]opies of purchase invoices for items offered or supplied to the beneficiary."[12]

The ALJ added:

> In only clarifying the requirements for pharmacy providers, the Department was not identifying new policy and, instead, was only making its past policy clearer. As discussed above, that past policy generally requires that providers maintain fiscal records, including fiscal records and copies of invoices for items supplied to beneficiaries, that fully disclose and document the extent of the services provided to beneficiaries, and, as such, the Department did not retroactively apply policy.

The ALJ properly noted that the IR audit and its conclusions in the present case were based on documentation requirements already in existence, and the circuit court did not err by making the general statement that the agency's decision was not arbitrary or capricious or otherwise infirm.[13] No retroactivity problem is apparent.

ER Drugs, at various points in its brief, takes issue with the statement in subsection 19.2 that DHHS can assume that beginning and ending inventory is the same in the absence of evidence to the contrary. But ER Drugs fails to delineate how this assumption resulted in a higher repayment amount. It argues that it tended to "stock up" on certain drugs in December. This is, apparently, an attempt to argue that there would be a higher-than-normal inventory level in January (the commencement month for the audit period), but ER Drugs provided no evidence regarding the extent of this stock-up. It only offered the extremely general allegation about "stock[ing] up," particularly on unspecified "fast-moving" drugs.[14] The upshot is that ER Drugs does not make a coherent argument, supported with concrete evidence, about how the inventory levels should have been used to alter the amount DHHS determined was owed in accordance with the allowed IR

---

[12] As noted, providers are advised that "fiscal records must be maintained," including, among other records, "[c]opies of purchase invoices for items offered or supplied to the beneficiary." Medicaid Provider Manual, General Information for Providers, Subsection 14.6.

[13] The circuit court did not expressly address the retroactivity argument.

[14] As noted, the audit period ended at the end of July 2016. ER Drugs did not indicate how quickly its December "stock up" of drugs tended to get depleted. ER Drugs also makes a general allegation that the inventory of certain drugs had decreased throughout the years because of a switch from brand-name to generic drugs. As stated earlier, however, it seems that the wholesale orders would have reflected the different "stock" levels referred to by Raad Kouza.

audit. In other words, ER Drugs, despite having had the chance to do so, has not adequately demonstrated how the assumption about inventory levels affected the ultimate amount owed.[15]

In conclusion, the circuit court did not err by upholding the decision of the DHHS that ER Drugs was required to repay $1,205,426.23 in Medicaid overpayments.

Affirmed.

/s/ Mark J. Cavanagh
/s/ Jane E. Markey
/s/ Deborah A. Servitto

---

[15] As for the argument ER Drugs makes regarding the alleged impossibility of performing under an alleged "contract" because of a fire and a flood, the ALJ and DHHS acted within their rights by not relying on any information about the fire and flood, as noted above in footnote 11. And there was not, contrary to the argument by ER Drugs, substantial compliance of any "contract" as a result of the provision of signature logs, seeing as signature logs were not relevant to the allowable IR audit (see, generally, Part V of this opinion).